**In the Matter of Contempt Proceedings against**

**Robert F. WILLIAMS.**

**No. 74, Docket 73–2697.**

United States Court of Appeals, Second Circuit.

Argued Sept. 30, 1974.

Decided Jan. 10, 1975.

___

Melvin L. Wulf, American Civil Liberties Union Foundation, New York City (Leon Friedman, American Civil Liberties Union Foundation, New York City, on the brief), for appellant.

Gerald A. Rosenberg, Asst. U. S. Atty., S. D. N. Y. (Paul J. Curran, U. S. Atty., S. D. N. Y., Dennison Young, Jr., and John W. Nields, Jr., Asst. U. S. Attys., S. D. N. Y., on the brief), for appellee.

Before HAYS, ANDERSON and MANSFIELD, Circuit Judges.

ROBERT P. ANDERSON, Circuit Judge:

The case of Robert F. Williams v. Trans World Airlines was tried in the United States District Court for the Southern District of New York from October 12, 1973 through October 16, 1973,[1] before Honorable Richard H. Levet, *Judge*, sitting without a jury. The suit was based upon a claim for damages by Williams, who had a valid and confirmed ticket on a particular flight by Trans World Airlines (TWA) from London, England to Detroit, Michigan, but who was refused carriage on the designated flight by TWA, allegedly because of unjust discrimination and racial prejudice in violation of the provisions of 49 U.S.C. § 1374(b). The district court held, however, that under the circumstances concerning Williams and his proposed air flight, TWA was authorized and justified under 49 U.S.C. § 1511[2] in refusing him passage. Williams appealed and the judgment has been affirmed by this court.[3]

Several times in the course of the trial the district judge threatened to hold Williams in contempt but actually de-

---

1. 369 F.Supp. 797 (S.D.N.Y.1974).

2. 49 U.S.C. § 1511 reads:

   "Authority to refuse transportation. Subject to reasonable rules and regulations prescribed by the Administrator, any air carrier is authorized to refuse transportation to a passenger or to refuse to transport property when, in the opinion of the air carrier, such transportation would or might be inimical to safety of flight."

3. 509 F.2d 942 (2 Cir. 1975).

ferred doing so until the end of the trial against TWA. During the morning of the last day of the proceedings the court issued an order to Williams to show cause why he should not summarily be held in contempt "by reason of disorderly conduct, failure to obey the instructions of the court, volunteering answers, [and] improperly attempting to question the court." [4] After both sides had rested later in the day, the court took up the show cause order. At the time the order issued there was a mixture of argument and testimony by Williams and his counsel, which ran on for a dozen and a half pages of transcript, until the court terminated it. There was no statement by Williams or argument by his counsel at the time the court declared him guilty. Following these introductory comments we turn to a recitation of the events leading to the contempt citation.

Because of an unavoidable delay in traveling from Michigan to New York, Williams was unable to reach New York in time for the commencement of the trial on Friday, October 12th, but counsel stipulated that the witnesses for the defense could testify first and the plaintiff could follow on Monday, October 15, which he did. As a result of this arrangement Judge Levet had heard the evidence about Williams' allegedly dangerous character, his schizophrenia, his habit of carrying arms, his tendency toward violence, revolution and political protest against racial segregation and unfair treatment of black people, as well as the information that Williams was under indictment for kidnapping in North Carolina and that he had been and still was a fugitive from justice. The judge was well aware of the many instances in which racial protest had been carried into the courtrooms for the purpose of disrupting and making a shambles out of the trials sought to be conducted there. By Monday, October 15th, when Williams testified, Judge Levet was reasonably certain that the court would probably be faced with protests against racial prejudice, disruption and obstruction to the orderly conduct of the trial. He was properly aware of his duty as the presiding judge to maintain order in the court and to keep the proceedings within lawful bounds. It is also apparent that he was determined to excise, at its very inception, the slightest indication of any deviation from his procedural directions, particularly anything on the part of the plaintiff or his counsel, which suggested argumentation or dissertation on matters involving race prejudice or socio-political theories.

The main thrust of the plaintiff's case was that TWA had acted unreasonably in refusing him passage from London to Detroit in fulfillment of the ticket plain-

---

4. The entire order in summary contempt, holding Williams guilty, is as follows:

"The undersigned Judge of the United States District Court for the Southern District of New York having heretofore directed that the above-mentioned R. Franklin Williams show cause as to why he should not be held in contempt by reason of disorderly conduct, failure to obey the instructions of the court, volunteering answers, improperly attempting to question the court, and a hearing having been held thereon on Tuesday, October 16, 1973 in court room 2704, during the trial of the above-entitled action, and the court having heard Melvin L. Wulf, Esq. of the American Civil Liberties Union, counsel for the said Williams, in opposition, and the court having heard the said Williams in opposition thereto, and it appearing from the said hearing and from the record of the trial of the above-mentioned action in which the said Williams was the plaintiff that no adequate reason was submitted as to why the said Williams should not be held in civil contempt of this court by reason of disorderly conduct, failure to obey the instructions of the court, volunteering answers, improperly attempting to question the court, it is hereby

Ordered that the said R. Franklin Williams be and he is hereby held in civil contempt of this court and that he is fined the sum of Fifty ($50.00) Dollars to be paid to the cashier of this court in room 602, United States Court House, Foley Square, New York City, New York, and an application having been made by counsel for the said Williams to stay any enforcement proceedings herein pending an appeal, the time of payment of the said fine is hereby deferred until the disposition of any appeal or the dismissal thereof or as otherwise ordered."

tiff had purchased, and that TWA had been derelict in its duty in not investigating the FBI's sources of information against him. In his brief he says,

> "In pursuit of that theory, plaintiff intended to show at trial, at no great length, the racially segregated condition of life in Monroe, North Carolina; plaintiff's leadership there in the black struggle for equality; the threats and attempts that had consequently been made against his life; that for that reason he had frequently carried weapons with him for self-defense; and the extreme bias against plaintiff by the Monroe, N. C. police, who were the source of the information contained in the FBI Wanted Bulletin."

Judge Levet ruled the offer of evidence of Williams' personal history, his struggles to overcome segregation, his conflicts with the Ku Klux Klan and the probable sources of the FBI's information to be irrelevant to plaintiff's claims against TWA but said he would admit some of it but "just generally" and indicated it would have to be connected with TWA and the making of its decision to refuse passage to Williams. In this context and obviously motivated by his apprehension that the case could easily get out of hand and be turned into a disorderly and disruptive protest demonstration, he endeavored to keep a very tight rein on Williams' testimony and showed curtness and impatience in limiting Williams' answers to questions. Although the contempt certificate speaks in conclusory terms of four different types of offenses against the court, there were no findings; an examination of the minutes of the trial, however, reveals that the offenses most frequently charged in the course of the trial, were "volunteering answers" and "failure to obey the instructions of the court," principally in testimony regarding various aspects of racial discrimination which, in the trial court's opinion, either went beyond the bounds of the court's "just generally" ruling—never clearly defined—or were not responsive to the questions asked.[5]

---

5. Examples of these are the following:

*Direct examination of Williams*

(A) "Q. Were you raised in Monroe, North Carolina, also?
A. Yes, I was raised in Monroe, North Carolina, and lived in the same house all my life.
The Court: Nobody asked you that, Mr. Williams.
Proceed. You understand what I mean, I hope. He volunteered some information.
Mr. Wulf: Yes, your Honor." [Tr. 82]

\* \* \* \* \* \*

(B) "Mr. Wulf: May I explain to your Honor?
The Court: No. I have agreed to take your question. Now, go on.
Let's have more testimony and less argument.
Mr. Wulf:
Q. Would you describe the conditions of racial segregation that existed in Monroe, North Carolina, during your childhood?
The Court: Just generally, sir.
The Witness: Well, if you are going to tell me what to say—
The Court: Yes, I am going to tell you what you may say. Let's get straightened out right away. I am the judge in this court. I have a duty to determine what questions may be answered. I hope you understand that.
The Witness: Yes.
The Court: In any event, that is my ruling.
The Witness: Yes. I hope you won't be prejudiced in your ruling.
The Court: I am not going to be prejudiced in my ruling. I resent that statement from you, sir.
The Witness: I resent being discriminated against in this country.

The Court: I haven't discriminated against you. I don't take any more except the question which was asked, which you are allowed to state, but I said to be brief and general about it. I am not going to take a book on this subject." [Tr. 84–85]

\* \* \* \* \* \*

(C) "Q. Would you answer the question, please, Mr. Williams.
A. Yes. I lived in a racist town that was—
The Court: A what?
The Witness: In a racist town that was—
The Court: What do you mean by that, sir?
The Witness: I mean they had signs on the water fountain that said, 'White

only.' I meant that I was arrested for sitting on a lunch counter stool reserved for white people only in a public place. It was a place where they brutally beat black people in the Police Department where there was no Fourteenth Amendment to the United States Constitution. That's what I mean by a racist town. I mean· that as a child I saw the Chief of Police who was over 6 feet tall drag a black woman up the street by her heels because he said that she was——
The Court: Are you through now?
The Witness: If you want me to be through, I'm through.
The Court: I think you have said enough on that subject. Counsel, I want to call this to your attention. The fact that this plaintiff was raised in a so-called racist town has nothing to do with what this defendant did.
Go on with this case." [Tr. 84–86]

\* \* \* \* \* \*

(D) "Mr. Wulf: I have been trying to explain for two days. You won't listen to me.
The Court: I am not going to listen to any such thing. I don't think it's relevant to this case.
Ask your questions specifically and I will rule on them if they seem to be off the track or if an objection is made. I am merely saying that it seems to me in all fairness here that the proof should relate to the cause of any act on the part of TWA which is unauthorized and is not borne out by some history of several years ago in the Town .of Monroe.
Mr. Wulf: That's because, your Honor, if I—
The Court: I will not listen to any more argument.
Do you understand me?
Mr. Wulf: I understand.
The Court: When I rule on a question of evidence, that's going to be it." [Tr. 86–87]

\* \* \* \* \* \*

(E) "Mr. Wulf: Since there's no motion to dismiss this and since we are here trying the case on the evidence, I will proceed and ask further questions along that line.
The Court: Not on this general subject.
Mr. Wulf: Are you ruling out questions about the condition—
The Court: Ancient race, yes, of his boyhood or whatever it was.
Mr. Wulf: How about adolescence, your Honor, can I proceed on that?
The Court: No.
Mr. Wulf: His adulthood?

The Court: I am going to ask you and your adversary to come into the robing room.
(In the robing room.)
The Court: I want to say, Mr. Wulf, that I regret very much to have to do this. When I try cases, I believe I am competent after 17 years on. this bench to determine what is or what is not an issue, and I am going to tell you now, as I have told you before, that I don't expect to have arguments over evidentiary questions, and if you go on in this manner, I shall have to consider asking you to show cause why you shouldn't be held for contempt. That is all. We will go back to the courtroom." [Tr. 87–88]

\* \* \* \* \* \*

(F) "The Court: You are not going to ask again about the issues which I have just decided.
Mr. Wulf: Are you ruling out questions about anything relating to the background of the kidnapping charge which was what—
The Court: You didn't ask about that at all, counsellor, so far." [Tr. 88]

\* \* \* \* \* \*

(G) "Q. What period of time was it that you carried those weapons in your car?
A. During the time that many threats—
The Court: No, strike that out. By year, date or month.
Q. Just the period of time, month and year.
A. From 1957 to 1961 when four attempts—
The Court: Wait. I want to instruct you. You are not to volunteer answers. Simply answer the questions which your lawyer propounds to you.
Do you understand me?
The Witness: Yes.
The Court: All right.
Strike out anything except what he said about carrying weapons in his car in 1957 through 1961." [Tr. 96]

\* \* \* \* \* \*

(H) "The Court: Did you have a permit?
The Witness: It wasn't necessary in the State of Carolina.
The Court: Strike that out, it wasn't necessary.
The Witness: Because the law—
The Court: I said strike it out. Counsellor, you understand what I mean. If this goes on, I shall have to resort to other efforts here, counsellor. I cannot conduct this case—
Mr. Wulf: I—
The Court: Wait a minute. I cannot conduct this case with this witness proceeding as he does and volunteering.

Do you understand me? You must not volunteer. Do you know what that word means?

The Witness: Your Honor—

The Court: Don't argue with me.

The Witness: I'm asking you a question.

The Court: You are not going to ask me questions. Your lawyer is going to ask you questions.

The Witness: But you—

The Court: Strike that out." [Tr. 97]

\* \* \* \* \* \*

(I) "The Court: When did you first learn about the FBI warrant?

The Witness: In September, your Honor, of 1961 I learned from the radio that the FBI had issued an all points bulletin.

The Court: That was only a few days after you left Monroe?

The Witness: Yes.

The Court: All right.

Q. Did there come a time, Mr. Williams, when you decided to return to the United States to surrender to the Federal Bureau of Investigation?

A. Yes.

Q. When was that? When did you decide to return? When did you make the decision to return?

A. I actually tried to return in 1965 from Cuba, but I couldn't get the necessary documents to enter this country from the State Department. So I went to China in 1966, and in 1967 I wrote from Peking—

The Court: You did what?

The Witness: I wrote a letter from Peking, China, in 1967 to the officials in North Carolina—

The Court: What officials?

The Witness: The court official, the clerk of court and the prosecutor of Union County Court asking what I had been indicted for, if they would inform me of the statute they had indicted me under and if they had any additional warrants for me other than the 1961 warrant.

I received letters from them stating that there were no additional warrants in 1961 and I expressed the desire that I was coming back.

The Court: You did what?

The Witness: I expressed to them my determination to return." [Tr. 108–109]

\* \* \* \* \* \*

(J) "Q. Did they issue passports for your wife and two sons?

A. Not then. I requested because I was hoping—

The Court: Never mind what you were hoping. The answer is no.

A. (Continuing) No.

The Court: All right." [Tr. 113]

\* \* \* \* \* \*

(K) "The Court: Had you done anything with respect to your American citizenship while you were in Canada or in China or in Tanzania? Had you rejected, if you please, or had you given up your American citizenship at any time?

The Witness: No, your Honor. I insisted that—

The Court: I didn't ask you what you insisted about. The answer is no." [115]

\* \* \* \* \* \*

(L) "The Court: Did you tell them you had some other place to go?

The Witness: Yes.

The Court: What did you tell them?

The Witness: I told them that I had a ticket—

The Court: No, some other place to stay, I should have said, in London that night.

The Witness: No, I told them I had money, that I could go to a hotel.

The Court: All right.

The Witness: They said I couldn't go to a hotel. They wanted to make sure that I would be on that plane the following morning.

The Court: I see.

Q. So you spent the night of September 5 in jail, right?

A. Yes.

Q. In prison?

A. Yes.

Q. And on the morning of September 6th, the day of your scheduled flight to Detroit, what happened?

The Court: What date was this again?

Mr. Wulf: The morning of September 6, your Honor.

The Court: Yes. What happened?

The Witness: They came to this dungeon and they said for me to get ready to go. I was going out into the reception area of the prison.

I went out and the warden said, 'Well, you are going to leave this morning.' This was about 9 o'clock.

He said, 'You are going to leave.'

I asked him if he was sure.

He said, 'Yes, they are coming to pick you up.'

I was sitting around out there in this reception area. He offered me coffee and everything and checked me out, gave me back my belongings.

Then at 10 o'clock I asked again, 'How can I catch a plane at 10 o'clock when it's already 10 o'clock?'

He said, 'Well, I don't know, but I thought sure those fellows were coming for you.'

I asked him if he would call.

The Court: Did he say what fellows?
The Witness: The CID, yes. I asked him if he would call to find out why. He called and he said, 'Well, you've got another problem now. We are willing to let you go, but you can't leave because TWA has cancelled your flight. TWA is refusing to take you.'
Q. Who told you that?
A. The warden.
Q. All right.
Continue.
A. And I told him I had a ticket and a reservation.
He said, 'No, they are refusing to take you.'
I asked him if he would see if I could go on another airline.
He said, 'No, you can't go on another airline. They even asked our airline not to take you. TWA is not only refusing to take you, they are asking all other airlines to cooperate with them in this.'
So he said, 'You are going to have to go back through this procedure.'
So I had to go back through the procedure of confinement again. They had to search me again, they had to take away my—the papers that they had given me. They had to take back my money and my belongings, and then they put me back again. Instead of the dungeon, they just put me in a regular cell, in a regular prison.
The Court: They gave you something to eat?
The Witness: Yes, they brought food, but the food was in a dirty pan. I didn't want the food and I didn't accept it." [Tr. 131–134]
*Cross-examination of Williams*
(M) "A. I owned two pistols and a rifle, and on some occasions I did. It wasn't just a practice that I just carried it. There was a reason.
The Court: At times at least you did that; is that so?
The Witness: Yes, your Honor, and maybe now I can state why—
The Court: No, nobody asked you that. You don't answer questions unless they are asked. I have said that several times. I am not going to have to tell you that again." [Tr. 163]

* * * * * *

(N) "Q. Did you receive national publicity? Was your position stated, printed in The New York Times?
A. Yes, because I was—
The Court: Never mind because. Did you hear me? I have said several times not to volunteer.
The Witness: I was only answering the question.

The Court: If this goes on again, I am going to stop and I will do something else.
Counsellor, I must admonish the witness. Counsel has a right to cross-examine without arguments from a witness being cross-examined." [Tr. 166]

* * * * * *

(O) "Mr. Warner: I am not putting it in for that reason.
Mr. Wulf: You are putting it in for the libel.
The Court: Address the Court, sir.
Mr. Wulf: That is my only reason.
The Court: Overruled.
Q. Do you recall that?
The Court: Answer the question.
The Witness: I don't know whether I should answer it or not.
The Court: You have to answer it.
The Witness: I don't want to upset you.
The Court: I am not upset. I am merely trying to keep this in an orderly fashion.
*Answer the question.*
The Witness: Is this TWA? You said you didn't want me to go into the history of racism.
The Court: Counsel, I shall have to advise this witness that if he continues along these lines, to repeatedly argue *with Court and counsel, I shall consider* before the close of this case holding him in contempt. You may advise him now if you want to privately up at the witness stand. I am not going to have this continue." [Tr. 167–168]

* * * * * *

(P) "A. To the best of my knowledge, that is not exactly what I read. I suppose there is different editions of The New York Times. I didn't have access to The New York Times at the time that these stories were being written.
Another thing that I would like to ask—
The Court: You don't ask questions. Get that out of your head." [Tr. 174]

* * * * * *

(Q) "The Court: You say you don't recall whether that piece was so published? What is your answer?
A. The answer is—
The Court: Don't make any speeches, just answer the question.
The Witness: The answer is because of forgeries I have to identify each piece—
The Court: That's no answer.
Go on, counsellor.
The Witness: I can't remember everything I said in my lifetime.
The Court: Why don't you say so instead of bringing in about forgeries or something." [Tr. 196]

* * * * * *

From the advantageous standpoint of hindsight, which is afforded a reviewing court, it becomes abundantly clear that the circumstances which generated the subject matter of the contempt were brought about by two fatal misconceptions. The first, on the part of the trial judge, was the assumed likelihood that the plaintiff would attempt to disrupt the orderly processes of the trial and use the proceedings as a sounding-board for racial protest and the enunciation of his socio-political views. The second was on the part of the plaintiff who, after years of struggling to combat the evils of race prejudice and discrimination, which had followed him like a malignant shadow practically all of his life, appraised the thoughts and motivations of others and the meaning and significance of actions and events, when adverse to him or his interests, as manifestations of racial discrimination. At the trial he became convinced that the trial judge was strongly prejudiced against him as a black man and that the judge's rulings and instructions stemmed not from the application of recognized principles of law, but from racial prejudice. This conclusion was reinforced in his mind when the court became increasingly strict in limiting the plaintiff's testimony as well as being severely critical of his responses to his attorney's questions on direct examination.

Whatever else may be said of Judge Levet's conduct of the trial, there is no evidence whatever to support the notion that his actions at any time were tainted

(R) "Q. Do you recall yourself having a telephone interview at that time with Station WBTV in Charlotte in which you told Station WBTV that you would not return on Saturday, August 30, 1969, but would, 'Wait until things were a little more favorable'? Do you recall giving that interview?
A. What was the date?
Q. On or about August 27, 1969.
A. I remember telling an executive that, but I didn't have an interview with him.
The Court: What executive?
The Witness: Executive of the film department because I was bringing in—
The Court: Executive of what?
The Witness: Of the television station's film department. I was bringing film out of China. I was negotiating with him to sell this film to the networks, but it wasn't an interview.
The Court: You told him that, whether you call it an interview or not; is that so?
The Witness: Yes." [Tr. 200–201]

\* \* \* \* \* \*

(S) "Q. Did you have any discussion with anybody when you bought that ticket?
A. No, only—
The Court: Only what?
The Witness: Nothing about the ticket. They just said that I should spend more time in Cairo to see their country.
The Court: That's a noble thought." [Tr. 203]

\* \* \* \* \* \*

(T) "The Court: You didn't ask for a non-stop flight from Africa to Detroit, did you?

The Witness: No, because they told me—
The Court: 'No' is the answer.
The Witness: No.
The Court: You still insist on putting 'because' in every time. You are a fairly intelligent man, I would say, and yet you repeatedly do what I told you not to do." [Tr. 204]

\* \* \* \* \* \*

(U) "The Court: . . .
Did you notice this when you got the ticket, that it was R. Franklin?
The Witness: No.
The Court: You didn't look at the ticket?
The Witness: I looked—
The Court: You didn't look at the ticket?
The Witness: No, because—
The Court: Never mind the 'because' business, which is your repetitious statement in answer to every question. You attempt to throw 'becauses' all over the place.
The Witness: Judge—
The Court: Keep still until you are asked a question." [Tr. 206–207]

\* \* \* \* \* \*

Redirect Examination
(V) "The Court: You are still under oath, Mr. Williams. Do you understand?
The Witness: Yes, sir.
The Court: May I again remind you not to volunteer any information whatsoever in answer to questions. Just answer the question." [Tr. 225]

or slanted by considerations of color or race.

Moreover, it is reasonably clear from the record before us that Williams, when he took the witness stand, had no intention or purpose to disrupt or delay the proceedings. This was further evidenced by his stipulation that the trial start two or three days before he could be present. As he now argues, he came into court as a plaintiff in a civil action, seeking the recovery of damages, and not as a defendant in a criminal case who was brought in against his will. There was nothing about his speech or conduct during the very inception of his testimony which would tend to confirm the court's fears. Early in the plaintiff's testimony, however, the court quite properly questioned the relevancy of plaintiff's counsel's question asking for a description of the conditions of racial segregation in Monroe, North Carolina in Williams' childhood. A short colloquy between court and counsel ensued and the court decided to admit the question but limited the scope of the answer by saying, "Just generally, sir." Although repeatedly thereafter the court declared to be irrelevant testimony regarding racial segregation and discrimination and the claimed false and prejudicial information given to the F.B.I. upon which its bulletin and reports were allegedly based, it continued to permit plaintiff's counsel to ask Williams to testify about similar matters in connection with the background for the kidnapping charge against Williams in North Carolina. The trial judge many times cautioned the plaintiff against volunteering and failing to confine his answers to the precise bounds of the questions. Unfortunately, however, the court was not entirely consistent in this regard and the record shows that at times Williams was tacitly encouraged to say more than a strict interpretation of the question called for. When the judge questioned the relevancy of plaintiff's counsel's "theory of the case," that the FBI bulletin and reports were based upon information given the FBI by the Monroe, N. C. police, who fabricated it out of racial hostility and prejudice against the plaintiff, counsel did not try to support his position by legal argument to the court but instead made emotionally toned attacks on the judge and his rulings which reinforced Williams' conviction that the judge was prejudiced against blacks and against him in particular.

■ On redirect examination of Williams the court took over some of the questioning, which concerned the origins of the kidnapping allegation; in the course of it the court charged Williams with volunteering testimony.[6] The plaintiff then accused the judge of an act of white supremacy and declared that the court was a white supremacy court.[7] The court issued an order to

6. "The Court: . . .

Let me ask you a question. Did you understand me when I said from time to time that you are not to volunteer in your answer? Did you hear that?
The Witness: I didn't consider myself volunteering. Your Honor, I have never practiced in your court. You just say that I'm not a lawyer. I don't know what your restrictions are. I can't read your mind. The Court: You don't have to ·read my mind. You can listen to my statements—
The Witness: I tried to.
The Court:—and instructions.
Did your lawyer instruct you in the interval yesterday?
·The Witness: Yes.
The Court: What did he tell you?
The Witness: Yes, the same thing.
The Court: Did he tell you not to volunteer?

The Witness: Not to volunteer, yes. I understood that.
The Court: You understood what he said, did you?
The Witness: But we have—
The Court: Don't argue with me now. Did you understand what your lawyer told you yesterday about not volunteering? Yes or no.
The Witness: But I didn't understand your concept of what volunteering is." [Tr. 242–243]

7. "Q. Were Mr. and Mrs. Stegall forced from their car at gunpoint?
The Court: By you.
The Witness: Not by me.
The Court: By somebody else?
The Witness: By three or four hundred black people who were enraged because blacks were being attacked.

**958**

Williams, "to show cause now during the trial of this case, . . . why he should not be held in contempt . . ." The court then asked plaintiff's counsel if he had anything to say, and counsel charged the judge with being responsible for and provoking the statements and behavior on the part of the plaintiff which the court regarded as contempt. He also accused the judge of "baiting" him and his client and of being impatient, hostile and rude. There followed argumentative colloquies between the judge and plaintiff's counsel and with the plaintiff himself. Although the court had stated that it intended to go forward immediately with the contempt citation, it did not do so. After the arguments between the court and the plaintiff and counsel, the redirect examination of the plaintiff resumed and was followed by recross-examination. Both parties then rested and counsel made their arguments in Williams v. Trans World Airlines. At the conclusion of the trial the contempt charge was taken up. Although the court referred to the proceeding as a civil contempt, it was a criminal contempt arising out of a civil action. See In Re Union Nacional de Trabajadores, 502 F.2d 113, 120 (1 Cir. 1974). The civil action itself was tried to the court alone, without a jury, and the rulings on evidence did not follow objections by counsel for TWA. In fact, in the course of the trial TWA's counsel offered few, if any, objections or motions to strike. The court itself raised practically all of the questions on admissibility in an effort strictly to confine Williams' testimony to what it considered relevant. Its manner of doing so appears to have been peremptory and brusque, which convinced Williams that the court was intent upon preventing him from proving his case because he, Williams, was black. While we are satisfied that the court was at no time motivated by any such consideration, the lack of clarity between what testimony was relevant and what was irrelevant, the lack of definite and unambiguous instructions to Williams, as a lay witness, as to what constituted a full and responsive answer to a question which did not, at the same time, become so extended that it crossed the boundary into the forbidden realm of testimony volunteered, i. e. that it went beyond the reasonable scope of the question, raises serious doubts as to the propriety of the citation for contempt. There are also issues concerning the lack of certification and of findings of fact, and whether in his colloquies with the plaintiff and with plaintiff's counsel the trial judge personally embroiled himself in a running controversy with the plaintiff and plaintiff's counsel.

The Court: Were you there?
The Witness: No, I was not there. I was in my house.
The Court: How do you know what was done then?
The Witness: This is what they said. That is their—
The Court: All right. I think this is immaterial.
The Witness: Judge, may I ask you a question?
The Court: No, you may not. You will answer questions.
The Witness: May I make a statement to the Court?
The Court: No, you may not. I told you that several times.
Q. Mr. Williams, this article says, 'that local officials and Mrs. Stegall said the capture of her and her husband had been part of an attempt by the Negroes to force the police to release the Freedom Riders and other members of their faction.'

Is that true?
A. As far as I'm concerned, no, because I don't know what the Negroes did with Mrs. Stegall. I wasn't there. It was a racial conflict brought about because of tyrannical oppression—
The Court: You are volunteering again. I want it to stop. This is the last warning I am going to give you.
The Witness: Judge, do you want me to answer?
The Court: I want you to answer the question, but only to answer the question. I don't want you to make a speech.
The Witness: Why don't you restrict them?
The Court: That's my business.
The Witness: This is white supremacy.
The Court: It's not white supremacy at all.
The Witness: It's a white supremacy court just like in Mississippi.
The Court: We are going to stop right now, counsellor." [Tr. 230–231]

■ The charge itself consisted of four conclusory allegations: disorderly conduct, failure to obey the instructions of the court, volunteering answers, and improperly attempting to question the court. For the purposes of review the lack of certification and the absence of factual findings which would state explicitly on what conduct each of these charges is based, are serious omissions. Rule 42(a), F.R.Crim.P., dealing with summary disposition in criminal contempt requires that the order of contempt "shall recite the facts . . . ." The trial court prefaced its order by saying, ". . . it appearing from said hearing and from the record of the trial . . . ," but this court, speaking through Judge Smith, had already ruled upon the inadequacy of such a procedure in reviewing a contempt order by the same trial judge,

> "If in basing the contempt conviction 'upon * * * the record of this court' Judge Levet intended to rely upon all the other contumacious incidents set forth in the government's appendix, we would doubt whether the certificate was sufficiently informative. While a certificate in support of a summary contempt conviction need not and probably should not set out all the relevant incidents verbatim from the record, it should summarize them, with appropriate references to the record, in such a way as to make clear their nature and contumacious tendency." United States v. Galante, 298 F.2d 72 at 75, n. 1 (2 Cir. 1962).

Pietsch v. President of United States, 434 F.2d 861, 864 (2 Cir. 1970), cert. den. 403 U.S. 920, 91 S.Ct. 2236, 29 L.Ed.2d 698 (1971). *See also* United States v. Schrimsher, 493 F.2d 842, 845 (5 Cir. 1974), which quotes, with approval, from United States v. Marshall, 451 F.2d 372, 375 (9 Cir. 1971), as follows:

> " 'Informed appellate review' is possible only if the facts are stated in sufficient detail for the appellate court to determine whether the conduct upon which the conviction rests was contemptuous, factually and legally;

whether it was of such character, and occurred in such circumstances, as to permit summary conviction under Rule 42(a), and because Rule 42 sentences are subject to appellate review and revision, whether the conduct relied upon justified the sentence imposed." (Footnotes omitted.)

With regard to the trial judge's personal embroilment in disputes over evidentiary issues which involved increasing personal overtones between the trial judge and plaintiff's counsel and between the judge and the plaintiff, a thorough study of the entire record discloses that these personal attacks and counter-attacks started early in the trial and culminated in the citation for contempt. It is true that the provocations ran both ways, but ". . . instead of representing the impersonal authority of law, the trial judge permitted himself to become personally embroiled with the petitioner" and his counsel. Taylor v. Hayes, 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974); Offutt v. United States, 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11 (1954). This raises the question of whether the contempt issue should have been heard by another judge who was not presiding at the time of the charged misconduct. But for reasons hereinafter stated we do not need to pass upon this claim in the present case.

The minutes of the trial make clear that the most frequent and most serious transgression in the view of the trial judge, on the basis of which he found the plaintiff in contempt, was plaintiff's proclivity to volunteer testimony which, once repeated, also constituted a failure to obey the instructions of the court. Although the trial judge was satisfied that Williams knew what "volunteering" meant and Williams' counsel had, at the direction of the court, privately informed Williams what was meant by it, the record does not disclose what those instructions were. Williams appears to have been intelligent and articulate and . was making a good faith effort to answer the questions propounded to him in a responsive and responsible manner.

As a layman he did not understand the rules of evidence and could not fully comprehend what constituted a complete and responsive, but narrowly precise answer to a specific question, particularly in view of the judge's rulings which called for the most terse and literal response conceivable to a specific question.

The matter was further confused by the court, in several instances, by permitting what it had been referring to as volunteering and therefore prohibited, to be received in evidence.[8] Moreover, instead of ruling out as entirely irrelevant the early history of Williams' life, his experiences with racial segregation and like matters, the court ruled it could be testified to, but "just generally." A lay witness should not be held in contempt where there is ambiguity in the court's directions. Granny Goose Foods Inc. v. Teamsters, 415 U.S. 423, 444, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974), citing International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967). The court's rulings on relevancy and on volunteering testimony were likely to confuse a layman, and Williams received no apparent help from counsel. ". . . [W]here there is ambiguity in the court's direction, it precludes the essential finding in a criminal contempt proceeding of willful and contumacious resistance to the court's authority." United States v. Joyce, 498 F.2d 592, 596 (7 Cir. 1974).

It is true that the record discloses several instances where it may be said that the plaintiff was discourteous and accusatory in his addresses to the court, particularly when he said that the judge was prejudiced and a racist, exercising white supremacy, and that the court was a white supremacy court. But the appellee expressly disclaims that the contempt order was based on these statements. In other circumstances such conduct might be held to be contumacious. Nothing in the record suggests that these remarks were accompanied by rude and hostile gestures, nor was Williams loud or boisterous or brazenly hostile. To warrant a conviction in criminal contempt, the contemnor's conduct must constitute misbehavior which rises to the level of an obstruction of and an imminent threat to the administration of justice, and it must be accompanied by the intention on the part of the contemnor to obstruct, disrupt or interfere with the administration of justice. Eaton v. City of Tulsa, 415 U.S. 697, 94 S.Ct. 1228, 39 L.Ed.2d 693 (1974); In re Little, 404 U.S. 553, 92 S.Ct. 659, 30 L.Ed.2d 708 (1972); United States v. Seale, 461 F.2d 345, 367–368 (7 Cir. 1972). A thorough review of the entire record in this case fails to disclose evidence sufficient to prove beyond a reasonable doubt that the plaintiff possessed such an intent in this case.

The judgment holding Williams in contempt is reversed.

8. See note 5, *supra*: (I), (L) and (R).