UNITED STATES of America,
Appellee,

v.

James G. MARTIN, Appellant.

Nos. 785, 786, Dockets 74–2293, 74–2524.

United States Court of Appeals,
Second Circuit.

Argued March 17, 1975.

Decided Sept. 5, 1975.
Certiorari Denied Dec. 15, 1975.
See 96 S.Ct. 570.

Sheila Ginsberg, New York City (William J. Gallagher, The Legal Aid Society, Federal Defender Services Unit, New York City, on the brief), for appellant.

George E. Wilson, Asst. U. S. Atty., New York City (Paul J. Curran, U. S. Atty., and John D. Gordan III, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before SMITH and TIMBERS, Circuit Judges, and BRYAN, District Judge.*

TIMBERS, Circuit Judge:

James G. Martin appeals (1) from a judgment of conviction entered November 15, 1974 after a six day jury trial in the Southern District of New York, Richard Owen, *District Judge*, finding him guilty on two counts of income tax evasion in violation of 26 U.S.C. § 7201 (1970), and (2) from a judgment of criminal contempt entered September 30, 1974 by the court during the trial pursuant to 18 U.S.C. § 401(3) (1970) for refusing to obey a lawful order of the court[1] directing defendant as a witness to answer a question. For the reasons below, we affirm.

I.

Viewing the evidence in the light most favorable to the government as we must at this stage, there was evidence from which the jury could have found as follows with respect to the income tax evasion charges.

The government established by the specific items method of proof that Martin failed to report and pay taxes on income of $14,603.59 for 1967 (Count 1) and $9,064.28 for 1968 (Count 2).

Martin had been associated with St. Agatha's Home for Children in Nanuet, New York, a non-profit child care agency run by the Sisters of Charity, from 1952 until June 1969 when his services were terminated. He worked as a bookkeeper and eventually became Director of Finance in 1964. He was in charge of all money coming in and going out, including the payroll, and was in charge of all financial reports. The Home's budget was between $2 million and $3 million during this period.

In 1968 the Home's outside accountants were unable to certify their audit because of missing bank statements, cancelled payroll checks, expense statements and cancelled expense checks. A subsequent investigation disclosed that, in addition to regularly recorded payroll checks which had been drawn payable to Martin (and which accounted for the gross income reported on his 1967 and 1968 returns), other checks which were unrecorded on the books of the Home also had been drawn payable to him, or to others and endorsed by him.

Some twenty-five witnesses testified, with respect to checks that purported to bear their endorsements, that they had not endorsed the checks made payable to them; that they had not authorized anyone else to do so; and that they had not received the proceeds of such checks. A handwriting expert who had examined these checks testified that in his opinion Martin had endorsed the checks.

The totals of such unrecorded checks which had been drawn payable to or endorsed by Martin, and which had been cashed by him, in 1967 and 1968 were $14,603.59 and $9,064.28, respectively. These are the amounts of unreported income on which Martin failed to pay income taxes for 1967 and 1968.

Martin, who testified on his own behalf, admitted that he had drawn unrecorded checks payable to himself and to others and that he had endorsed them. He acknowledged going to the race track several times a week and obtaining loans from finance companies to cover his gambling debts. He denied, however, that he had embezzled any funds from the Home. He claimed that he had used

---

* Frederick vP. Bryan, of the Southern District of New York, sitting by designation.

1. Martin was sentenced on the two counts of income tax evasion to concurrent terms of a year and a day on each. On his contempt conviction, a six month sentence was imposed, to run consecutively to his income tax evasion sentence.

the proceeds from the checks he had cashed to pay the Home's debts, including payments to the government for delinquent withholding taxes. He claimed that he drew the bogus checks to help cover up shortages amounting to approximately $200,000.

When pressed on cross-examination as to the details of this defense, Martin gave only vague, contradictory answers. He claimed to have first discovered shortages in the late 1950's. At times during his testimony, he stated that he did not know who was responsible for the shortages or why it was necessary to cover them up. At other times, he intimated that he did know who was responsible and that the cover-up was necessary to protect the person whom he refused to name and to avoid being blamed himself for the shortages. He claimed to have told someone—but refused to identify the person—about the shortages in the late 1950's. He admitted that since that time he had not reported the shortages either to his superiors at the Home or to its outside accountants.

Martin's credibility was undermined in numerous other respects, including his admission that he had lied when he testified that he did not recall who his superior was in the late 1950's and by evidence that he had claimed four dependent children on his income tax returns in 1967 and 1968, when in fact he had only three.[2]

## II.

Martin claims error in his income tax evasion convictions in three respects: (1) the court's charge on the issue of his credibility; (2) the court's supplemental instructions in response to two questions from the jury during its deliberations; and (3) the prosecutor's summation. We find no merit in any of these claims.

■ On the issue of the defendant's interest and credibility, the court informed the jury of the personal interest of the defendant in the outcome of the trial[3]—an interest, the court pointed out, which is not incompatible with a defendant's capability of telling the truth.

Aside from the failure of defense counsel to object to the charge in this respect as required by Fed.R.Crim.P. 30,[4] the instruction was in accordance with those which repeatedly have been approved by us. See, e. g., *United States v. Sclafani*, 487 F.2d 245, 257 (2 Cir.), *cert. denied*, 414 U.S. 1023 (1973); *United States v. Sullivan*, 329 F.2d 755, 756–57 (2 Cir.), *cert. denied*, 377 U.S. 1005 (1964). And there was no claim of alibi or similar affirmative defense on which

---

**2.** There of course was a great deal of other evidence. Since Martin does not challenge the sufficiency of the evidence to support his income tax evasion convictions, the foregoing summary is sufficient for an understanding of our rulings on the claims of error he does raise.

**3.** The portion of the charge on the interest of the defendant as it bears on his credibility was as follows:

"Now the law permits but does not require the defendant to testify on his own behalf. Obviously a defendant has a deep personal interest as a result of his prosecution, indeed it is fair to say he has the greatest interest in its outcome.

Interest creates a motive for false testimony and a defendant's interest in the result of his trial is of a character possessed by no other witness.

In appraising his credibility, you may take that fact into consideration.

However, I want to say this with equal force to you—however, it by no means follows that simply because a person has a vital interest in the end result, that he is not capable of telling a truthful and straightforward story.

It is for you to decide to what extent, if at all, defendant's interest has affected or colored his testimony."

**4.** Not only did defense counsel fail to object, but during summation he had said to the jury:

"You will be instructed that if a defendant takes the stand he certainly has a motive to lie. Shall we say his neck is on the line there and he certainly has a motive to lie. And you are there to judge that . . . But you also have to judge, just because someone has an interest in a case or a motive to lie I wonder whether that person was telling the truth."

the court's instruction might be said to have been applied by the jury to impose an affirmative burden on Martin.

We turn next to Martin's claim that he was prejudiced by the court's supplemental instructions in response to two questions asked by the jury during its deliberations. In answer to the jury's first question as to the definition of taxable income, the court stated that it was income after exemptions and deductions upon which the tax rate is applied. As an illustration, the court referred the jury to one of the tax returns in evidence and particularly to line 11(d) where taxable income was set forth. Aside from the fact that again no exception to this supplemental instruction was taken by defense counsel,[5] the court's response was in accordance with the definitions set forth in 26 U.S.C. §§ 61(a) and 63(a) (1970), was consistent with the court's definition of taxable income in its main charge, and was not prejudicial to Martin.

The jury's second question was whether as a matter of law the government had to prove that Martin had made personal use of embezzlement proceeds in order to show unreported taxable income. The court's answer, properly framed so as not to go beyond the scope of the question asked, was correct. The court informed the jury that the government had to show unreported taxable income to Martin but that it need not show how he had spent the money after it became his income, if the jury should find that it was income to him. The court had informed the jury in its main charge that Martin could not be found to have embezzled money and have the proceeds attributed to him as income unless he wrongfully had taken it for his own use and benefit. What the court had not covered in the main charge was that the government was not required to prove how Martin had spent the money after he had appropriated it to his own use. The jury therefore questioned the need for *proof of the use of embezzlement proceeds,* not whether *proof of embezzlement* had to be shown. The court's answer was directly responsive to the jury's question in the context of the charge as a whole; did not undermine Martin's defense that he had not embezzled the money in the first place; and was not prejudicial to Martin.

Martin's claim that he was prejudiced by various remarks of the prosecutor in summation can be disposed of summarily. Aside from the absence of any objection by defense counsel to the prosecutor's summation, we find that the remarks now challenged, considered in the context of all that occurred at the trial, did not prejudice Martin. *United States v. White,* 486 F.2d 204, 206–07 (2 Cir. 1973), *cert. denied,* 415 U.S. 980 (1974); *United States v. Bivona,* 487 F.2d 443, 447 (2 Cir. 1973).

Since we find no merit in any of Martin's claims of error with respect to his income tax evasion convictions, the judgment of conviction on both counts is affirmed.

### III.

Martin's contempt conviction stemmed directly from his refusal, after being directed to do so by the court, to answer a question by the Assistant United States Attorney as to the identity of the person to whom Martin first reported the shortages in the books of St. Agatha's Home for Children (referred to above in our summary of the evidence).[6] We hold that Martin's refusal to obey the lawful order of the court constituted

---

5. Moreover, the colloquy between court and counsel as to the proper response to be given to this question indicates substantial agreement on the part of defense counsel with respect to the answer as given by the court.

6. Martin's refusal to answer the question could hardly have been more unequivocal and defiant:

    "The Witness: Well, the answer is that I did bring it to somebody's attention, your Honor, and as far as naming names at this stage of the game if we stay here till doomsday I wouldn't name anybody."

a violation of 18 U.S.C. § 401(3) (1970),[7] for which he properly was adjudicated in contempt of court.

When the court first addressed Martin in the robing room after his refusal to answer the question, the court specifically stated that its proposed finding of contempt would be pursuant to § 401(3). At that time the court informed Martin that under § 401(3) "You are in disobedience of a lawful order of this Court." The robing room colloquy ended with the court again stating unequivocally that a sentence for contempt would be imposed for Martin's "failure after being directed by the Court to answer the specific question as to those told about this shortage when he first learned about it." Later, in its order of October 1, 1974 adjudging Martin in criminal contempt and imposing a six month sentence of imprisonment, the court specifically based the contempt conviction on Martin's refusal to answer the question and found that his conduct was "in violation of 18 U.S.C. § 401(3)." On this record, we think the court made it clear, from the beginning to the end of the contempt aspect of the case, that it intended to proceed under § 401(3), and did.

■ As the Supreme Court said in *Yates v. United States*, 355 U.S. 66, 73 (1957), "A witness, of course, cannot 'pick and choose' the questions to which an answer will be given. The management of the trial rests with the judge and no party can be permitted to usurp that function." And here, as in *Yates*, it also is clear that the fact that a witness who refuses to answer a question is the defendant under cross-examination does not preclude a finding of contempt within the meaning of § 401(3), absent a Fifth Amendment ground for refusing to answer. We note also, in view of the discussion below with respect to the independent grounds specified in §§ 401(1) and 401(3) for a contempt adjudication, that it is significant that, although *Yates* involved a contempt adjudication for refusal to answer questions, the Supreme Court did not indicate that such refusal to obey an order of the court must rise to the level of an obstruction of justice to be punishable under the contempt power.

■ Here, Martin was the last witness to testify. He was given an opportunity to reconsider his refusal to disclose the name of the person whom he had told of the shortages. He adhered to his refusal to answer. On these facts, we think that the court acted well within the discretionary authority granted to it by § 401(3) to punish for criminal contempt the refusal by Martin to obey a lawful order of the court.

Since we uphold the contempt conviction under § 401(3), there is no necessity for us to determine whether Martin's conduct constituted an obstruction of justice within the meaning of 18 U.S.C. § 401(1) [8] as well.[9] True, the court did

7. "§ 401. *Power of court*
A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—
* * *
(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

8. "§ 401. *Power of court*
A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—
* * *
(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;"

9. The Supreme Court recently suggested in *United States v. Wilson*, 421 U.S. 309, 314–16 (1975), that refusal to answer questions in a criminal trial could constitute obstruction of justice. Although the issue before the Court was whether summary procedure, rather than a notice and hearing procedure, was appropriate, the Court stated:
"The refusals were contemptuous of judicial authority because they were intentional obstructions of court proceedings that literally disrupted the progress of the trial and hence the orderly administration of justice. . . . Respondents' contumacious silence . . . [after] an explicit, unambiguous order to testify, impeded the due course of [the] trial perhaps more so than violent conduct in the courtroom." 421 U.S. at 315–16.

emphasize the seriousness of Martin's refusal to answer the question and the extent to which such refusal blocked efforts to determine the truth or falsity of his defense. In so doing, the court likened the refusal to an obstruction of justice—at the hearings on the contempt proceedings and in the order of October 1. At no time, however, did the court purport to be proceeding under § 401(1) and certainly its judgment of contempt was not entered pursuant thereto.

■■■ We have carefully considered whether our recent decision in *Matter of Williams*, 509 F.2d 949, 960 (2 Cir. 1975), should be read as having incorporated the obstruction of justice requirements of § 401(1) into § 401(3). We conclude that it should not be so read. In *Williams* the contemnor had been held in contempt pursuant to Fed.R.Crim.P. 42(a) " 'by reason of disorderly conduct, failure to obey the instructions of the court, volunteering answers, [and] improperly attempting to question the court.' " 509 F.2d at 951. In concluding that a "thorough review of the entire record" *in that case* did not support the contempt conviction, the *Williams* court stated:

> "To warrant a conviction in criminal contempt, the contemnor's conduct must constitute misbehavior which rises to the level of an obstruction of and an imminent threat to the administration of justice, and it must be accompanied by the intention on the part of the contemnor to obstruct, disrupt or interfere with the administration of justice." 509 F.2d at 960.

In support of this conclusion, the Court cited *Eaton v. City of Tulsa*, 415 U.S. 697 (1974); *In re Little*, 404 U.S. 553

(1972); and *United States v. Seale*, 461 F.2d 345, 367–68 (7 Cir. 1972). *Eaton* and *Little* were both appeals from contempt convictions under state statutes governing conduct tending to interrupt trial proceedings. *Seale* was an appeal from a contempt conviction under 18 U.S.C. § 401(1) for obstruction of justice.

The statutory pattern of § 401 is clear on its face. In each of its subsections, separate and independent grounds are specified on the basis of which "A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other . . . ." The independent grounds then specified in the subsections of § 401 are as follows:

> "(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
>
> (2) Misbehavior of any of its officers in their official transactions;
>
> (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

Clearly, the requirement that the contumacious conduct be such as "to obstruct the administration of justice" is the ground for a contempt adjudication under § 401(1), but not under § 401(2) or § 401(3).

Thus, the conclusion in *Williams* that the disruptive conduct disclosed by the record in that case did not rise "to the level of an obstruction of and an imminent threat to the administration of justice" cannot reasonably be read as incorporating into § 401(3) the requirements of § 401(1). It is hardly necessary for us to disclaim on behalf of the *Williams*

---

Moreover, in its only reference to the substantive statute with whose implementation it was concerned, the Court quoted from 18 U.S.C. § 401(1), rather than (3). 421 U.S. at 315 n. 6.

In most cases where a witness refuses to testify at a criminal trial, the question whether an obstruction of justice requirement is an element of a § 401(3) offense would not affect the outcome of a contempt proceeding. Courts

uniformly have held that silence as to matters material to a criminal proceeding could constitute contempt, and they have so held without considering whether obstruction of justice had to be found. The Supreme Court's decision in *United States v. Wilson* suggests in more explicit fashion that such a refusal to testify would constitute obstruction of justice.

court any intent to accomplish by adjudication what Congress has not considered appropriate to do by legislation, namely, to write into § 401(3) the requirements of § 401(1).

We hold that Martin's contempt conviction under § 401(3) for disobedience of a lawful order of the court did not require a finding of obstruction of justice.

We come finally to Martin's claim that his contempt conviction should be reversed because he substantially complied with the court's order. We find this claim to be especially unpersuasive in a notably unappealing case.

After he was directed to disclose the name of the person whom he told of the shortages, Martin flatly refused.[10] He then was given a further opportunity to disclose the name and avoid an adjudication of contempt. He refused.[11] When later asked to identify his immediate superior in the late 1950's, he said he did not remember. Then he changed that testimony, stating that he had lied. Even then, rather than revealing the identity of his immediate superior, he simply said, "Well, that was part of the conference we had inside", referring to a conference about Martin's refusal to state the name of the person to whom he revealed the shortages. The net result, after all his backing and filling, is that Martin never did name the person to whom he purportedly reported the shortages.

Since we find no error in the court's contempt adjudication which was well within the court's discretionary authority conferred by statute, we affirm the contempt conviction, as well as the income tax evasion convictions.

Affirmed.

---

**10.** See note 6, *supra*.

**11.** The court properly rejected the explanation offered by Martin's counsel that, as a .matter of conscience based on religious beliefs, Mar-

tin could not implicate a person who was said to be a nun. As in *Smilow v. United States*, 465 F.2d 802 (2 Cir.), *vacated on other grounds*, 409 U.S. 944 (1972), such explanation is not a valid ground for refusing to answer.