**UNITED STATES of America,**
**Petitioner-Appellant,**

v.

**MARTIN LINEN SUPPLY COMPA-**
**NY et al., Respondents-Appellees.**

Nos. 72–2796, 72–2800.

United States Court of Appeals,
Fifth Circuit.

Oct. 9, 1973.

Irwin A. Seibel, Antitrust Div., Dept. of Justice, Washington, D. C., William S. Sessions, U. S. Atty., Hugh P. Shovlin, Asst. U. S. Atty., San Antonio, Tex., for petitioner-appellant.

Mervin C. Pollak, New York City, Brice A. Tondre, J. Burleson Smith, San Antonio, Tex., for respondents-appellees.

Before THORNBERRY, AINSWORTH and RONEY, Circuit Judges.

RONEY, Circuit Judge:

This is an appeal from orders of the District Court resulting in the dismissal before trial of civil and criminal contempt petitions brought by the United States charging violations of a final judgment in a civil antitrust action. Contrary to the argument of the respondents, we hold that we have appellate jurisdiction to review these orders which we reverse on the ground that the conduct charged in the petitions could constitute a violation of the antitrust decree.

The antitrust judgment, a consent decree, prohibited each corporate defendant linen supplier [1] (collectively referred to herein as "Martin"), from threatening, coercing, inducing or attempting to induce any linen rental supplier to refrain from furnishing linen supplies to any customer. The contempt argument centers on the interpretation and subsequent application to be given this prohibition in relation to Martin's alleged activities.

The appellate jurisdiction problem is difficult. Under the Expediting Act, the Supreme Court has exclusive jurisdiction of appeals from final judgments in every civil action wherein the United States is complainant.[2] Under the

---

1. The corporate defendants include Martin Linen Co. and Texas Sanitary Towel Supply Corp. (Cascade Linen Service). Tex-Mart Corp., which had been named as a defendant in the original complaint and consent decree, was not named as respondent in the petitions. Respondent William B. Troy is included because he is the controlling stockholder and president of both Martin Linen Supply and Cascade Linen Service.

2. Section 2 of the Expediting Act, as amended (15 U.S.C.A. § 29) provides:

   In every civil action brought in any district court of the United States under [the antitrust laws], wherein the United States is complainant, an appeal from the final judgment of the district court will lie only to the Supreme Court.

   Tidewater Oil v. United States, 409 U.S. 151, 93 S.Ct. 408, 34 L.Ed.2d 375 (1972).

Criminal Appeals Act, the Court of Appeals has jurisdiction in a criminal case to review a decision, judgment or order dismissing an indictment or information except where the double jeopardy clause of the Constitution prohibits further prosecution. A criminal contempt prosecution in an antitrust case has been held to be a "criminal case" within the meaning of 18 U.S.C.A. § 3731.[3] United States v. Goldman, 277 U.S. 229, 48 S.Ct. 486, 72 L.Ed. 862 (1928).

At bar is an appeal from a criminal contempt proceeding over which we have review jurisdiction, and an appeal from a civil contempt proceeding which, standing alone, is beyond our jurisdiction. To further complicate the jurisdictional picture, the District Court entered a separate order "construing" the final antitrust judgment in the civil suit. Although Martin contends that this construction order was a "final judgment" within the Expediting Act, thereby precluding review by our Court, we reason that the construction order is actually a part of the contempt proceedings and should be handled in the same manner as if it were a ruling within the context of a contempt proceeding. Since we have jurisdiction over the criminal contempt appeal, we will additionally review the civil contempt appeal on the rationale of judicial economy found in cross-claim, pendant and ancillary jurisdiction. To hold otherwise would require the same parties to litigate basically the same issues in two different courts at the same time.

*The Proceedings Below*

In 1969, the United States filed a civil complaint in the District Court alleging that Martin restrained trade in violation of the Sherman Act, 15 U.S.C.A. § 1 et seq., with respect to the business of furnishing linen supplies in the state of Texas. In June, 1969, after negotiation, a consent decree was entered as final judgment in the suit.

In December, 1971, the United States filed the separate civil and criminal contempt petitions under review alleging violations of Section V(A)(1) of the consent decree. That Section provides

> Each corporate defendant is enjoined and restrained from, directly or indirectly:
>
> (A) threatening, coercing, inducing or attempting to induce:
>
> > (1) Any linen rental supplier to refrain while in business, from furnishing linen supplies to any customer . . . .

The activities which the Government allege violated the consent decree revolve around Martin's attempts to exact reciprocal agreements from other linen suppliers not to compete for Martin's customers, backed up by warnings of economic reprisals.

After full pre-trial discovery, Martin filed a petition in the original antitrust proceeding for construction of the above Section.[4] The District Court determined that the allegations by the Government centered on Martin's activities aimed at recoupment of its own former

---

3. 18 U.S.C.A. § 3731 states
   > In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information as to any one or more courts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution. . . .
   > The provisions of this section shall be liberally construed to effectuate its purposes.

4. Jurisdiction was retained under Section X of the consent decree:
   > Jurisdiction is retained for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders or directions as may be necessary or appropriate for the construction or the carrying out of this Final Judgment, for the modification or termination of any of the provisions hereof for the purpose of enabling the plaintiff to apply to this Court for the enforcement of compliance herewith and for the punishment of violations hereof.

customers and retaliations against competitors who solicited its customers. The Court concluded that Section V(A)(1) of the consent decree does not prevent Martin from threatening competitors with economic reprisals to persuade them to refrain from soliciting Martin's customers.[5]

Subsequent to the entry of the construction order and based thereon, the District Court dismissed the criminal and civil contempt petitions against Martin.

### The Construction Order

Martin contends that the construction order interpreting a provision of the antitrust consent decree was a final judgment in a civil action and that, since the United States was the complainant, appeal lies only to the Supreme Court under the Expediting Act. The construction order, however, was initiated, viewed in light of, and decided upon the allegations of the contempt petitions. Although the application for construction of the antitrust decree and the construction order bore the caption and docket number of the contempt proceedings, the application was made after the date for the trial of the contempt charges had been set. It was made to the District Judge who was to hear the contempt petitions and not to the District Judge who entered the consent decree in the original antitrust suit. The Memorandum of Points and Authorities accompanying the application referred to the charges in the contempt petitions numerously and stated that the interpretation urged by the Government "in the pending contempt proceedings" would have adverse consequences. Immediate construction was urged in order to "narrow the factual issues of the pending contempt petition trials" and provide a basis for "reappraisal of the entire contempt proceedings and their termination or other disposition without trial."

The District Judge acknowledged in his opinion and order that the application was made "at this time because of the pendency of criminal and civil contempt proceedings . . . ." After interpreting Section V(A)(1) of the consent decree, he found that the activities alleged in the contempt petitions and particularized in supplementary papers did not violate the Section. Three weeks later, on June 12, 1972, the District Court dismissed the contempt petitions in accordance "with this Court's Memorandum Opinion dated May 18, 1972, in Civil Action No. SA–69–C4–114 [the original antitrust suit]."

■ It is evident the construction order was a ruling integral with the contempt proceedings, and not a final judgment within the meaning of the Expediting Act. *See* United States v. Indrelunas, 411 U.S. 216, 93 S.Ct. 1562, 36 L. Ed.2d 202 (1973). To hold otherwise would allow the captioning of the application and construction order to override the substance of the ruling. United States v. Jorn, 400 U.S. 470, 478 n.7, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); United States v. Sisson, 399 U.S. 267, 279 n. 7, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970); United States v. Hark, 320 U.S. 531, 536, 64 S.Ct. 359, 88 L.Ed. 290 (1944).

■ We hold that we have jurisdiction to review the construction order in connection with any review jurisdiction we have of the contempt proceedings.

### Double Jeopardy

Although admitting that we have jurisdiction to review criminal contempt proceedings, Martin contends that the

---

5. Accordingly the Court finds:
    1. The provisions of Section V(A)(1) do not prohibit Martin and Cascade from recouping business lost to competitors, from engaging in price wars and retaliatory sales campaigns to effect such recoupment, and from threatening to engage in those activities.

2. None of the activities of Defendants charged as violations of Section V(A)(1) in Paragraphs 10, 11, 12 and 13 of the Contempt Petitions and in the Supplementary Papers, violate the injunctions of that Section.

dismissal of the criminal contempt petition in this case was tantamount to an acquittal and that the double jeopardy clause of the Constitution would prevent a trial in the event we reversed the District Court. If such were the case, a review would be inappropriate. *See* United States v. Sisson, 399 U.S. 267, 90 S. Ct. 2117, 26 L.Ed.2d 608 (1970).

■ Martin bases its claim on the extensive pre-trial discovery which it reasons confronted the Court with the merits of the Government's claims. Jeopardy is not always an easy concept to determine. "[A] defendant is placed in jeopardy in a criminal proceeding once the defendant is put to trial before the trier of facts, whether the trier be a jury or a judge." United States v. Jorn, 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971). In the case of a jury trial, a defendant is deemed to have been put in jeopardy when the jury is empanelled and sworn. Illinois v. Somerville, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973); Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963). In a non-jury trial, jeopardy attaches when the court begins hearing evidence. Hunter v. Wade, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949).

■ The mere arraignment and pleading to an indictment or the conduct of a preliminary examination does not place the defendant in jeopardy. Collins v. Loisel, 262 U.S. 426, 429, 43 S.Ct. 618, 67 L.Ed. 1062 (1923); Bassing v. Cady, 208 U.S. 386, 391–392, 28 S.Ct. 392, 52 L.Ed. 540 (1908). Nor does the dismissal on a *nolle prosequi* when the witnesses have been sworn but before any have testified. Newman v. United States, 133 U.S.App.D.C. 271, 410 F.2d 259 (1969).

The Supreme Court has admonished us, however, to avoid any rigid rule and evaluate each case according to its facts. Illinois v. Somerville, *supra.* Indeed, this Court has noted the absence of fixed rules by which to measure an individual case. McNeal v. Hollowell, 481 F.2d 1145 (5th Cir. 1973).

■ In the case at bar the trial was admittedly in the pre-trial stages. It is true that the Government disclosed the nature of its case in the extensive pre-trial procedures ordered by the District Judge, but this did not commence a "hearing" of the evidence. The trial had not yet begun. Martin was never in jeopardy because it is "when the trial commences . . . that the constitutional policies underpinning the Fifth Amendment's guarantee are implicated . . . ." United States v. Jorn, *supra,* 400 U.S., at 480, 91 S.Ct., at 555.

We find the authority relied upon by Martin to be inapplicable. United States v. Findley, 439 F.2d 970 (1st Cir. 1971), United States v. Ponto, 454 F.2d 657 (7th Cir. 1971), United States v. Grochowski, 454 F.2d 655 (7th Cir. 1971), and United States v. Gustavson, 454 F.2d 677 (7th Cir. 1971), are "draft act" cases [6] which precluded appeal by the Government. They did not turn on the double jeopardy clause. All of the cases were decided under the Criminal Appeals Act, 18 U.S.C.A. § 3731, prior to its amendment by the Omnibus Crime Control Act of 1970, § 14(a), 84 Stat. 1890. Under the prior Act, appeal was limited, not only by the double jeopardy clause, but also by statutory constraints. In deciding *Findley, Ponto, Grochowski,* and *Gustavson,* the Courts relied on these statutory constraints rather than the double jeopardy clause.

The First Circuit stated in *Findley* that the defendant had "[a]dmittedly . . . not formally been put in jeopardy. . . . Collectively we believe this was an approach not in terms of double jeopardy, but in terms of the kind of error section 3731 was intended to cover." 439 F.2d at 973.

The Seventh Circuit in *Ponto,* sitting *en banc,* discussed the applicability of

---

6. Prosecution for refusal to submit to induction under the Military Selective Service Act of 1967, 50 U.S.C.A. App. § 462(a).

the double jeopardy clause: only three members of the five-judge majority were persuaded that the Constitution barred an appeal. 454 F.2d at 663. The two members of the majority who had concurred in the result on statutory grounds did not join in the opinion on the constitutional grounds. 454 F.2d at 665. The four dissenting judges disagreed on both statutory and constitutional grounds: they felt that the constitutional guarantee against double jeopardy was inapplicable since the trial had not begun and jeopardy had not attached. 454 F.2d at 667–668. A similar distribution in the voting occurred in the companion case, *Gustavson*. There, only seven members heard the case *en banc*. Only five expressed an opinion on the double jeopardy issue. Of these, two voted that it barred the appeal and three voted that the clause was inapplicable.

Since the draft act cases were not decided on jeopardy grounds, they do not support Martin's argument that jeopardy has attached in this case.

### Civil Contempt Jurisdiction

■ The civil contempt petition is virtually identical to the criminal contempt petition. Since the dismissal of the criminal contempt petition is appealable to this Court, the civil contempt petition may also be heard here on the basis of judicial economy.[7] Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 612–618, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966), is illustrative of the judicial economy reasoning. In that case, the Federal Maritime Commission entered a reparation order directing a carrier to pay damages to a shipper. Both the carrier and the shipper appealed, each intervening in the appeal of the other. The Court of Appeals had jurisdiction to review the shipper's claim for an increase in damages, but did not have jurisdiction over the carrier's appeal

which properly lay in the District Court through an enforcement proceeding by the shipper. The Supreme Court held that the Court of Appeals could properly review both appeals.

With the jurisdiction of the Court of Appeals properly invoked by the shipper, there is, therefore, every reason to permit the carrier not only to litigate the amount of the reparation order but also to insist upon a determination of the validity of the Commission's order, both with respect to the carrier's violation of the Act and with respect to the reparation award itself . . . . The minimal disadvantages resulting to the shipper from permitting the carrier to attack the reparation order are more than offset by the desirability of a prompt and efficient determination of the validity of the Commission's order . . . . And, once the carrier intervenes in the shipper's appeal, all the parties interested in the complete resolution of the validity of the Commission's order are before the court. In this situation it would make little sense to require the carrier to break off his argument short of its logical conclusion and relitigate it anew before a district court in an enforcement action.

383 U.S. at 616–617, 86 S.Ct. at 1024–1025.

Consideration of the appeals jointly in the case at bar is supported by the holding in two kinds of cases. First, in cases arising under the former Criminal Appeals Act, the Supreme Court required the Court of Appeals to review both grounds if the District Court's ruling was on alternative grounds, one appealable under the statute to the Supreme Court and the other to the Court of Appeals. United States v. Swift & Co., 318 U.S. 442, 444–445, 63 S.Ct. 684, 87 L.Ed. 889 (1943). Second, in cases

---

7. The rationale of judicial economy to prevent duplicity in the federal system has precedent in the policy underlying cross-claims, pendent and ancillary jurisdiction. Moore v. New York Cotton Exchange, 270

U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926); Smith Petroleum Service, Inc. v. Monsanto Chemical Co., 420 F.2d 1103, 1113–1115 (5th Cir. 1970); 2A Moore, Federal Practice, ¶ 8.07[5] (2d ed. 1972).

involving a single order for civil and criminal contempt in which the Supreme Court has held that the criminal aspect of the order controls for purposes of determining the procedure on appeal. *See* Union Tool Co. v. Wilson, 259 U.S. 107, 110, 42 S.Ct. 427, 66 L.Ed. 848 (1922) (cross writ); In re Merchants' Stock & Grain Co., 223 U.S. 639, 32 S.Ct. 339, 56 L.Ed. 584 (1912) (contempt decree containing both remedial and punitive provisions).

Without deciding whether we would have jurisdiction to review the civil contempt proceeding were it standing alone or were it substantially different than the criminal petition, we hold that we have jurisdiction to review the dismissal under the facts of this case.

### Contempt Charge

At this juncture it is necessary to review the language of Section V(A)(1) of the consent decree:

### V.

Each corporate defendant is enjoined and restrained from directly or indirectly:

(A) Threatening, coercing, inducing or attempting to induce:

(1) Any linen rental supplier to refrain, while in business, from furnishing linen supplies to any customer . . . .

A consent decree is the manifestation of a negotiated settlement where the defendants in the original suit relinquished their right to litigate the issues of antitrust liability, relying fully on the decree terms. *See* United States v. Armour, 402 U.S. 673, 681–683, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971). It is necessary to look to the consent decree in its entirety to ascertain the meaning of the various sections as intended by the parties. United States v.

Atlantic Rfg. Co., 360 U.S. 19, 22, 79 S. Ct. 944, 3 L.Ed.2d 1054 (1959). In so doing the trial court and this Court must give weight to the plain meaning of the words used. United States v. Armour, *supra* 402 U.S. at 682, 91 S.Ct. 1752. This caveat works to the protection of both parties.

Relying on the plain meaning of the words, the thrust of Section V(A)(1) is to prohibit Martin from engaging in activity which is aimed at causing any linen supplier to refrain from furnishing linen supplies to any customer. "Causing any linen supplier to refrain" is the key phrase of the section. The method used to procure the forebearance from competition is secondary: threats, coercion, and inducements by Martin are prohibited by V(A)(1) if they are aimed at a competitor with the intent to have that competitor refrain from competing with Martin.

The Government alleged that the following activities were violative of Section V(A)(1):

threats of recoupment, threats of price wars and threats of retaliatory sales campaigns to induce competitors to enter into reciprocal agreements not to compete for customers, and to refrain from soliciting and taking customers from Martin . . . .

The District Court, after addressing itself to these allegations, held that "soliciting," "competing," and "taking" were not synonymous with "furnishing linen supplies." "Furnishing linen supplies" was limited to delivering linen supplies. By so defining the phrase, none of the activity alleged by the Government was within the prohibition of Section V(A)(1) since the allegations were not addressed to furnishing linen supplies.

In examining the entire consent decree, however, the word "furnishing" appears in several different sections.[8]

8. Section II(c):
   "Linen rental supply business" means the business of *furnishing* clean linen supplies;
   Section IV:
   Each defendant is enjoined and restrained from entering into, adhering to, enforcing or claiming any rights under any contract, agreement, understanding, plan or program with any person, not owned or controlled by such defendant, to directly or indirectly:
   (A) Fix, determine, maintain, stabilize or adhere to prices, discounts, or terms or

This repeated use of the words "furnish" or "furnishing" in conjunction with the "linen supplies" indicates that the words are used collectively in this decree to describe the business in which the respondents are engaged. The words "furnish linen supplies" are used in the same manner in Section V(A)(1) and accordingly that section should be interpreted to mean that the defendants are prohibited from using threats, coercion and inducements to persuade their competitors to refrain from "doing business" with any customer.

Next, the District Court looked at the methods alleged by the Government to have been used by Martin. Finding that they centered on recoupment and retaliation, the Court stated that Martin may recoup business lost to competitors "by any means, including below cost prices, lump sum cash payments, loans, free services, gratuities and other inducements. . . ." It was a simple step for the Court to conclude that Martin "may also say, in advance, that they will engage in these same activities. The speculative effect of verbalization cannot be different than that of the deeds verbalized." As a consequence of this reasoning, the District Court found:

1. The provisions of Section V(A)(1) do not prohibit Martin and Cascade from recouping business lost to competitors, from engaging in price wars and retaliatory sales campaigns to effect such recoupment, and from threatening to engage in those activities.

The activities of recoupment and retaliation are not *per se* violations of Section V(A)(1). They are violations, however, if their announced purpose is to cause Martin's competitors to refrain from competing, since the Section prohibits activities which "directly or indirectly" attempt "to induce" competitors *"to refrain"* from doing business.

It may be acceptable, as the District Court found, for Martin to engage in activity to recoup business. There is a difference, however, in activities of recoupment aimed at the customers and the threats of recoupment aimed at the competitors. We are mindful of the fact that recoupment practices may have the side effect of discouraging competition. Such flows from the normal course of business. But the use of threats directed at competitors to restrain competition, or to obtain reciprocal noncompetitive agreements, as the Government alleges, goes to the heart of the antitrust problem. Such activity was recognized and prohibited by Section V(A)(1).

The District Court concluded that the alleged activities by Martin against competitors were unsuccessful. The Court accepted tables submitted by Martin "showing that for more than three years there has been a constant interchange of accounts between Martin . . . and some one hundred competitors in the State of Texas." This information is not dispositive of the issue: it is irrelevant under Section V(A)(1) whether or not Martin's competitors were actually

conditions of sale, for the *furnishing* of any linen supplies to any third person;

(B) Divide, allocate or apportion markets, territories or customers for the furnishing of any linen supplies or otherwise restrict competition between or among linen rental suppliers;

(C) Cause any seller of linen supplies to boycott or refuse to sell linen supplies to any linen rental supplier; . . . .

Section V(G):

Discussing or exchanging with any linen rental supplier, prices or price lists for the *furnishing* of linen supplies to any customer, or exchanging with, *furnishing* to or receiving from any linen rental supplier or linen rental suppliers, any list of

customers or customer accounts served by any linen rental supplier; . . . .

Section VI:

Each corporate defendant is enjoined and restrained from *furnishing* or offering or threatening to *furnish* linen supplies to a customer or potential customer on terms or conditions which involve below cost prices, lump sum cash payments to the customer, loans (other than bona fide loans by a defendant to its then existing customers), free service, gratuities or other similar inducements to obtain a contract or renewal of a contract for the *furnishing* of linen supplies, for the purpose or with the effect of eliminating a competitor or competitors.

induced to refrain from competing. The issue is whether Martin either directly or indirectly threatened, coerced, induced, or attempted to induce such action.

Assuming that the allegations by the Government in the contempt petitions and supplementary papers are factually true, Martin attempted to engage other linen suppliers in noncompetitive agreements and attempted to curtail competition under threats, coercion and inducements of retaliatory sales campaigns. Such alleged activity aimed at restraining competition is a *prima facie* violation of Section V(A)(1).

We have only assumed, as did the District Court, that the allegations are true. The District Court must now address the factual issues in the case. We remand for such purpose.

Reversed and remanded.