**In re John S. IRVING, General Counsel, National Labor Relations Board, a Witness Under Subpoena to Produce Documents, Appellant.**

**UNITED STATES of America, Plaintiff,**

v.

**Anthony DiLAPI, Robert Rao, Sidney Lieberman, Benjamin Ladmer, Stephen Kingston, David Bergner, and Interstate Dress Carriers, Inc., Defendants-Appellees.**

Nos. 740–741, Dockets 79–1017, 1018.

United States Court of Appeals, Second Circuit.

Argued Feb. 7, 1979.

Decided April 12, 1979.

---

4. The trial court's award for back pay and liquidated damages was clearly within the meaning and intent of the statute.

Susan Tepper Papadopoulos, Mary Schuette, W. Christian Schumann, Peter Winkler, N. L. R. B., Washington, D. C. (John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Norton J. Come, Deputy Associate Gen. Counsel, Paul Elkind, Asst. Gen. Counsel and Margery E. Lieber, Deputy Asst. Gen. Counsel, Washington, D. C., of counsel), for appellant.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Martin London, Ronald W. Meister and David Dunn, New York City, of counsel), for defendant-appellee Interstate Dress Carriers, Inc.

Edward R. Korman, U. S. Atty., E. D. N. Y. and Thomas P. Puccio, Attorney-in-Charge, U. S. Dept. of Justice, Organized Crime Strike Force, E. D. N. Y., Brooklyn,

N. Y. (James D. Harmon, Jr. and Lawrence H. Sharf, Special Attys., New York City, of counsel), for the United States, amicus curiae.

Marchi Jaffe Cohen Crystal & Mintz, New York City (Jay A. Katz, David Jaffe, New York City and David R. Taxin, Washington, D. C., of counsel), for Local 102, ILGWU, amicus curiae.

Before MANSFIELD and TIMBERS, Circuit Judges, and WERKER, District Judge.*

WERKER, District Judge:

John S. Irving, General Counsel of the National Labor Relations Board, appeals from two orders of the United States District Court for the Eastern District of New York (Bramwell, J.), entered on January 12, 1979, adjudicating Irving to be in contempt of court. The first order imposes a $10,000 fine. The second fines Irving an additional $1,000 per day until he complies with the court's order. A stay pending appeal was granted.

The events leading up to these orders of contempt are as follows. On April 5, 1978, Local 20408, United Warehouse, Industrial and Affiliate Trades Employees Union, filed a representation petition with the Newark Regional Office of the NLRB (the "Board") seeking recognition as collective bargaining agent for certain employees of G.S. Supply Associates, Inc. and G.S. Temporary Service, Inc. employed at a terminal of Interstate Dress Carriers, Inc. ("IDC") in Jersey City, New Jersey. This petition was later amended to include additional IDC employees at terminals in Jersey City and New York.

On September 6, 1978, a criminal indictment was returned in the Eastern District of New York charging nine defendants, including IDC and Local 102, International Ladies Garment Workers Union, with conspiracy and obstruction of an administrative proceeding in violation of 18 U.S.C. §§ 2,

371 and 1505. Included in the charges were alleged efforts to bribe and induce Matthew Eason, president of Local 20408, into withdrawing his petition, threats of physical harm and economic injury against Eason, and threats of loss of employment against the employees of IDC, G.S. Supply and G.S. Temporary Service. After a series of efforts by Local 102 and IDC to obtain production of certain "authorization cards" (i. e., membership applications executed by employees as a showing of interest in having Local 20408 represent them), IDC, on December 29, 1978, served two subpoenas on Board personnel directing them to produce at the criminal trial on January 3, 1979 all "authorization cards or applications for membership in Local 20408" and "other writings" concerning a "showing of interest" by employees in Local 20408. On January 3, the Board and the prosecution moved to quash on the ground that the cards were privileged.

The district court, on January 8, 1979, denied the motion to quash and ordered the Board to turn the cards over to the defendants. The Board appealed to this court, which, on January 9, 1979, entered an order dismissing the appeal and denying the Board's application for mandamus. *United States v. DiLapi*, 529 F.2d 1209 (2d Cir. 1979). John Irving, General Counsel of the Board and custodian of the cards, nonetheless refused to disclose, and IDC moved for dismissal of the indictment. This motion remains pending in the district court. Irving was held in contempt by Judge Bramwell on January 12, 1979 by two orders, one imposing a flat fine of $10,000, and the second imposing fines of $1,000 per day until he complies. Both orders are now stayed pending the Board's instant appeal from the orders of contempt. Both Local 102 and the United States Attorney for the Eastern District of New York have filed amicus briefs. The record indicates that if the contempt orders are upheld here, the Board will relinquish the cards.

---

* Honorable Henry F. Werker, District Judge of the Southern District of New York, sitting by designation.

### 1. *Appellate Jurisdiction*

We are met at the threshold with IDC's argument that neither of the two contempt orders issued below are "final" orders within the meaning of 28 U.S.C. § 1291, and therefore neither are within this court's appellate jurisdiction. Invoking the well-established rule that orders of civil contempt against parties to pending proceedings are not appealable, *see Fox v. Capital Co.*, 299 U.S. 105, 107, 57 S.Ct. 57, 81 L.Ed. 67 (1936); *International Business Machines Corp. v. United States*, 493 F.2d 112, 117–19 (2d Cir. 1973), *cert. denied*, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974); 15 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3917 (1976), IDC argues first that both the orders below were orders of civil contempt, and second that the General Counsel to the Board, as part of the government, is "party" to the criminal proceedings below.[1]

With respect to the first order of contempt, imposing a flat fine of $10,000, we conclude that it is an order of criminal contempt and therefore immediately appealable as a final order. *See Union Tool Co. v. Wilson*, 259 U.S. 107, 111, 42 S.Ct. 427, 66 L.Ed. 848 (1922); *International Business Machines Corp. v. United States*, 493 F.2d at 114. The chief characteristic of civil contempt is that its purpose is to compel obedience to an order of the court to enforce the rights of the other party to the action. *Nye v. United States*, 313 U.S. 33, 42, 61 S.Ct. 810, 85 L.Ed. 1172 (1941); *McCrone v. United States*, 307 U.S. 61, 64, 59 S.Ct. 685, 83 L.Ed. 1108 (1939); *International Business Machines Corp. v. United States*, 493 F.2d at 115. Consistent with this remedial purpose, the sanction imposed is generally made contingent on compliance. *Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); *Penfield Co. v. SEC*, 330 U.S. 585, 590, 67 S.Ct. 918, 91 L.Ed. 1117 (1947); *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 442, 31 S.Ct. 492, 55 L.Ed. 797 (1911). This is often accomplished by a purgation provision, whereby a civil contemnor may purge himself of contempt at any time by compliance. *See generally* C. Wright, A. Miller, J.E. Cooper, *supra*, § 2960. The purpose of an order of criminal contempt, on the other hand, is punitive. It is imposed to vindicate the court's authority. *Nye v. United States*, 313 U.S. at 43, 61 S.Ct. 810; *see generally* Dobbs, *Contempt of Court: A Survey*, 56 Cornell L.Rev. 183, 235–39 (1971). Accordingly, compliance with the court's command will not lift the sanction. In responding to a single contemptuous act, a court may well impose both criminal and civil sanctions—wishing to vindicate its authority and to compel compliance. *Id.* at 236–37.

This is what the district court intended here. In his first order, imposing on Irving a flat fine of $10,000 for "wilful" contempt, Judge Bramwell captioned his order in a criminal contempt format, followed the language of Fed.R.Crim.P. 42(a), and made no provision for purgation. The fine was punitive, levied regardless of subsequent compliance. We find that this order held Irving in criminal contempt and is therefore immediately appealable.

We also find that the second order, which imposes a continuing fine of $1,000 per day and contains a provision for purga-

---

1. IDC also argues that, even assuming one of the contempt orders is criminal, neither is final because its motion to dismiss the indictment is still pending before the district court, which therefore has not yet finished imposing "sanctions" for the government's refusal to produce the cards. While it is true that a contempt order is not final until sanctions have been imposed, *see* C. Wright, A. Miller & E. Cooper, *supra*, § 3817 at 617, it seems to us that the pendency of a motion to dismiss a criminal indictment based on the prosecution's failure to disclose is unrelated to the contempt sanctions here, which are clearly limited to the fines set forth in the orders below. Should dismissal ultimately become proper, it would not be a sanction stemming from contempt, but rather the vindication of a criminal defendant's right to discovery of evidence material to his defense. *See United States v. Andolschek*, 142 F.2d 503 (2d Cir. 1944). Even assuming dismissal were deemed a "sanction" of sorts, it would be a sanction running against the prosecution rather than the General Counsel, who is, of course, the contemnor here.

tion, has coercion as its primary purpose and constitutes an order in civil contempt. Therefore, to determine whether this order is immediately appealable, it is necessary to consider whether Irving, as General Counsel to the Board, is a "party" to the criminal proceeding below.

■ IDC, viewing the "government" as a monolith, argues in effect that the government (i. e., the Justice Department) is prosecuting the criminal action below, and therefore, the government (i. e., the General Counsel to the Board) is "party" to the action. Refining this argument somewhat, IDC cites authority indicating that the duty of disclosure in criminal cases affects not only the prosecutor but the government as a whole. See United States v. Caldwell, 148 U.S.App.D.C. 20, 543 F.2d 1333, 1352 n. 91 (D.C. Cir. 1974), cert. denied, 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); United States v. Bryant, 142 U.S.App.D.C. 132, 439 F.2d 642, 650 (1971); United States v. Grayson, 166 F.2d 863, 870 (2d Cir. 1948). See also Harvey Aluminum (Inc.) v. NLRB, 335 F.2d 749, 754 (9th Cir. 1964). Assuming this to be so, however, it has only marginal bearing on the question of whether the General Counsel of the Board is a "party" to a criminal proceeding for the purposes of determining whether an immediate appeal can be taken from an order of civil contempt. The Supreme Court, in Cobbledick v. United States, 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed. 783 (1940), while holding that a non-party witness could not appeal a denial of a motion to quash a grand jury subpoena, noted in dictum that appeal would become available if the non-party were to be held in contempt for noncompliance. The Court stated as the rationale for this rule the following:

> At that point the witness' situation becomes so severed from the main proceed-

ing as to permit an appeal. To be sure, this too may involve an interruption of the trial or of the investigation. But not to allow this interruption would forever preclude review of the witness' claim, for his alternatives are to abandon the claim or languish in jail.

309 U.S. at 328, 60 S.Ct. at 542. See also Alexander v. United States, 201 U.S. 117, 121–22, 26 S.Ct. 356, 50 L.Ed. 686 (1905) (dictum); Fenton v. Walling, 139 F.2d 608, 610 (9th Cir. 1943), cert. denied, 321 U.S. 798, 64 S.Ct. 938, 88 L.Ed. 1086 (1944) (since non-parties have no appeal from a final judgment, they have no right of review unless they can appeal independently); accord, David v. Hooker, Ltd., 560 F.2d 412, 417 (9th Cir. 1977). See generally 9 J. Moore, Federal Practice ¶ 110.13[4], at 167 (2d ed. 1975). Therefore, it is significant, as the Board argues, that the General Counsel has no control over a criminal prosecution brought by the Justice Department nor any right of appeal from a final decision.[2] Furthermore, the Board is not subject to direct control by the Executive Branch, but rather is an independent regulatory agency created by statute, see 29 U.S.C. § 153(a), and the General Counsel has certain authority independent of the Board. 29 U.S.C. § 153(d). We conclude that the General Counsel is not a "party" to the criminal proceeding here and, therefore, can bring the instant appeal from the civil contempt order below.[3]

### 2. Effect of this Court's January 9, 1979 Decision

Yet another preliminary issue stands between us and the merits of this case. As noted above, the Board, on January 9, 1979, appealed the district court's denial of its motion to quash and also petitioned for

---

2. This case is therefore quite different from our recent decision in In re Attorney General of the United States, 596 F.2d 58 (2d Cir. 1979), where we held that the Attorney General, who was named in his official capacity as a party defendant, was a "party" to the action and therefore barred from appeal. 596 F.2d at 62.

3. Moreover, since both orders arise from the same conduct and raise the same issues, general policies favoring judicial economy and the avoidance of inconsistent results dictate that the civil order be reviewed at the same time. See United States v. Martin Linen Supply Co., 485 F.2d 1143, 1148–49 (5th Cir. 1973), cert. denied, 415 U.S. 915, 94 S.Ct. 1412, 39 L.Ed.2d 470 (1974).

mandamus. This court, *United States v. DiLapi*, 595 F.2d 1205 (2d Cir. 1979), held that denial of a motion to quash is not appealable under 28 U.S.C. § 1291 and that the district court did not clearly exceed its powers so as to warrant mandamus. The court also noted that "Judge Bramwell did not abuse his discretion in finding that the material sought here may be important to preparation of the defense." IDC now urges that this determination is dispositive here.

We believe that this court's January 9 findings, made in connection with its refusal to grant a government petition for mandamus to block issuance of a subpoena by a district court during a pending criminal proceeding, do not necessarily imply that contempt sanctions subsequently imposed by the district court for noncompliance were proper. Standards for the issuance of mandamus are strict, *see In re Attorney General of the United States*, 596 F.2d 58, 62–63 (2d Cir. 1979); *National Super Spuds, Inc. v. New York Mercantile Exchange*, 591 F.2d 174, 181–82 (2d Cir. 1979); *American Express Warehousing, Ltd. v. Transamerica Insurance Co.*, 380 F.2d 277, 283 (2d Cir. 1967), and this is particularly so in connection with efforts by the government to obtain interlocutory review of orders in criminal cases. Traditionally, the writ has been used only "to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so," *Roche v. Evaporated Milk Association*, 319 U.S. 21, 26, 63 S.Ct. 938, 941, 87 L.Ed. 1185 (1943), and to avoid a judicial "usurpation of power." *De Beers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212, 217, 65 S.Ct. 1130, 89 L.Ed. 1566 (1945). The party seeking mandamus has "the burden of showing that its right to issuance of the writ is 'clear and indisputable.'" *Will v. Calvert Fire Insurance Co.*, 437 U.S. 655, 662, 98 S.Ct. 2552, 2557, 57 L.Ed.2d 504 (1978) (plurality opinion); *Bankers Life & Casualty Co. v.*

*Holland*, 346 U.S. 379, 384, 74 S.Ct. 145, 98 L.Ed. 106 (1953). Although these traditionally narrow limits on issuance of the writ have been recently somewhat expanded in certain cases, *see, e. g., La Buy v. Howes Leather Co.*, 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957) (authorizing "supervisory" mandamus); *Schlagenhauf v. Holder*, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964) (mandamus to settle "novel and important" questions); *see generally* Note, *Supervisory and Advisory Mandamus under the All Writs Act*, 86 Harv.L.Rev. 595 (1973), special considerations which arise when the underlying proceeding is a criminal prosecution make careful limitations on mandamus particularly appropriate. *See Will v. United States*, 389 U.S. 90, 96–98, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967); *United States v. Weinstein*, 511 F.2d 622, 626 (2d Cir.), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2655, 45 L.Ed.2d 693 (1975); *Stans v. Gagliardi*, 485 F.2d 1290, 1292 (2d Cir. 1973); *United States v. DiStefano*, 464 F.2d 845, 850 (2d Cir. 1972).

In *Will v. United States*, 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967), a district judge, confronted with a refusal by the prosecution in a criminal case to furnish certain information sought by defendants in a bill of particulars and ordered by the court to be produced, indicated his intention to dismiss the indictment. The court of appeals issued a writ of mandamus directing the district judge to vacate his production order. The Supreme Court reversed. After noting that the judicial caution traditionally associated with mandamus must be heightened in criminal cases due to concerns regarding double jeopardy, speedy trial, and narrow statutory limitations on prosecutorial appeal, *Will v. United States*, 389 U.S. at 96–98, 88 S.Ct. 269, the Court found that since the district court had neither exceeded its power nor engaged in any calculated and repeated disregard of the rules governing federal criminal trials,[4] *id.* at 100, 88 S.Ct.

---

4. This latter finding was accompanied by the observation, 389 U.S. at 100 n. 10, 88 S.Ct. 269 n. 10, that those cases involving the use of mandamus to "police procedural rules" (*i. e.*,

those cases expanding the availability of mandamus for "supervisory" purposes) were civil cases and indicated that the rule might not apply in criminal cases. Since the record in

269, the court of appeals had erred in issuing mandamus. The Court made amply clear that the mere fact that a district judge's order may be erroneous does not make issuance of mandamus appropriate. A lower court has "power" to make mistakes.

> Courts faced with petitions for the peremptory writs must be careful lest they suffer themselves to be misled by labels such as "abuse of discretion" and "want of power" into interlocutory review of nonappealable orders on the mere ground that they may be erroneous. "Certainly Congress knew that some interlocutory orders might be erroneous when it chose to make them nonreviewable."

*Id.* at 98 n. 6, 88 S.Ct. at 275 n. 6 (citations omitted). *See also United States v. DiStefano,* 464 F.2d at 850; *Stans v. Gagliardi,* 485 F.2d at 1292 (both per Friendly, J.).

■ We conclude that once this court found in its January 9 ruling that the district court had not exceeded its power, there was, absent some showing of "a calculated and repeated disregard of governing rules," *see United States v. DiStefano,* 464 F.2d at 850, nothing left to decide. Since the record here is devoid of such a showing, we find that the language regarding "abuse of discretion," in the context of a decision on a mandamus petition, while entitled to some consideration, was dictum. Accordingly, the question of whether Judge Bramwell properly exercised his discretion in issuing the contempt orders disputed here remains to be decided.

### 3. *The Motion to Quash*

■ Rule 17(c) of the Federal Rules of Criminal Procedure provides that a subpoena duces tecum may be quashed or modified if production of the documentary evidence sought would be "unreasonable or oppressive." The party seeking production has the burden of showing that production would not be "unreasonable or oppressive" by establishing:

> *Will* supported no systematic or deliberate noncompliance with procedural rules, the Court

(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

*United States v. Nixon,* 418 U.S. 683, 699–700, 94 S.Ct. 3090, 3103, 41 L.Ed.2d 1039 (1974) (footnote omitted), *citing United States v. Iozia,* 13 F.R.D. 335, 338 (S.D.N.Y. 1952) (Weinfeld, J.). Because this four-tiered test is composed of factual issues that must be resolved by the trial court, the decision to quash or modify a subpoena duces tecum must be left to the trial judge's sound discretion. *United States v. Nixon,* 418 U.S. at 702, 94 S.Ct. 3090; *United States v. Berrios,* 501 F.2d 1207, 1212 (2d Cir. 1974). Accordingly, the trial court's decision is not to be disturbed on appeal unless it can be shown that it acted arbitrarily and abused its discretion or that its finding was without support in the record. *United States v. Nixon,* 418 U.S. at 702, 94 S.Ct. 3090; *United States v. Berrios,* 501 F.2d at 1212.

[11] On the record before us, it cannot be said that the district court abused its discretion or acted without support in ordering production of the authorization cards. If the cards are in fact forged or otherwise fraudulent, they may provide the defendants with a basis for asserting an entrapment defense. Additionally, the defendants could certainly utilize the cards in attempting to impeach Eason's credibility. Thus, the district court did not abuse its discretion in finding "that the documents subpoenaed bear on the transaction underlying the instant indictment and are material to adequate preparation of IDC's defense . . . ." We conclude that the requirements of Rule 17(c) were satisfied.

left the question open. *See* Note, *supra,* 86 Harv.L.Rev. at 622–28.

 The United States and the Board, however, assert a claim of privilege and contend that the district court did not properly take into account the privileged nature of the authorization cards. The United States and the Board are correct to the extent that authorization cards are indeed privileged material exempt from discovery during Board proceedings [5] and from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.[6] The Board's long-standing policy of maintaining the confidentiality of authorization cards and the courts' exempting of the cards from FOIA disclosure are based on the fear of reprisals and the "chilling effect" which would result from disclosure to employers or rival unions.[7]

In this case, the important public interest in maintaining the confidentiality of the cards clashes head on with the defendants' fundamental right to due process of law, for it has been found that the cards are material to the defendants' defense of the criminal charges asserted against them. In similar situations, the Supreme Court has engaged in a balancing process, weighing the conflicting interests involved. *See, e. g., United States v. Nixon*, 418 U.S. at 707–13, 94 S.Ct. 3090 (executive privilege); *Roviaro v. United States*, 353 U.S. 53, 61–

---

**5.** The National Labor Relations Act provides that employees have the right to form labor organizations and to bargain collectively through representatives of their own choosing free from interference and coercion from either employers or unions. 29 U.S.C. §§ 157, 158(a), (b). Consequently, the Act requires representation elections to be held by secret ballot. 29 U.S.C. § 159(e)(1). To ensure that secrecy is maintained, the Board has traditionally restricted discovery in labor relations proceedings. *See generally Lyman Printing & Finishing Co.*, 183 NLRB 1048, App. A at 1055–56 (1970), and cases therein cited. This policy has generally been upheld by the courts. *E. g., Title Guar. Co. v. NLRB*, 534 F.2d 484, 487 (2d Cir.), *cert. denied*, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976); *NLRB v. Interboro Contractors, Inc.*, 432 F.2d 854, 858 (2d Cir. 1970), *cert. denied*, 402 U.S. 915, 91 S.Ct. 1375, 28 L.Ed.2d 661 (1971); *Electromec Design & Dev. Co. v. NLRB*, 409 F.2d 631, 635 (9th Cir. 1969); *NLRB v. Vapor Blast Mfg. Co.*, 287 F.2d 402, 407 (7th Cir.), *cert. denied*, 368 U.S. 823, 82 S.Ct. 42, 7 L.Ed.2d 28 (1961).

It should also be noted that the rules and' regulations of the Board prohibit Board employees from producing "any files, documents, reports, memoranda, or records of the Board or of the general counsel, whether in response to a subpoena duces tecum or otherwise, without the written consent of the Board or the chairman of the Board if the document is in Washington, D. C., and in control of the Board; or of the general counsel if the document is in a regional office of the agency or is in Washington, D. C., and in control of the general counsel. . . ." 29 C.F.R. § 102.118(a)(1).

**6.** *Pacific Molasses Co. v. NLRB*, 577 F.2d 1172 (5th Cir. 1978) (FOIA does not compel disclosure of union authorization cards); *Committee on Masonic Homes v. NLRB*, 556 F.2d 214 (3d Cir. 1977) (union authorization cards are exempt from FOIA disclosure). This circuit recently held that even the number of autho-

rization cards submitted during an organizational campaign is exempt from disclosure under the FOIA. *American Airlines, Inc. v. National Mediation Bd.*, 588 F.2d 863 (2d Cir. 1978). *See also NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978) (prehearing witness statements are exempt from FOIA disclosure at least until completion of Board unfair labor practice proceeding); *Title Guar. Co. v. NLRB*, 534 F.2d 484 (2d Cir.), *cert. denied*, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976) (prehearing statements of employees and union representatives are exempt from FOIA disclosure to extent such disclosure would interfere with Board enforcement proceedings).

**7.** In *Pacific Molasses Co. v. NLRB*, the Fifth Circuit recognized the dangers threatened by the disclosure of authorization cards:

[I]t is impossible to minimize the seriousness of the threatened invasion. We would be naive to disregard the abuse which could potentially occur if employers and other employees were armed with this information. The inevitable result of the availability of this information would be to chill the right of employees to express their favorable union sentiments. Such a chilling effect would undermine the rights guaranteed by the N.L.R.A., and, for all intents and purposes, would make meaningless those provisions of the N.L.R.A. which guarantee secrecy in union elections.

577 F.2d at 1182. *Accord, Committee on Masonic Homes v. NLRB*, 556 F.2d at 220–21. *See NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. at 239–40, 98 S.Ct. 2311; *Title Guar. Co. v. NLRB*, 534 F.2d at 491.

The threat of violence in the instant case has been substantiated by the affidavit of James D. Harmon, dated January 5, 1979. This sealed affidavit, which was submitted by the United States, was not considered by the district court.

62, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957) (informer privilege).[8] The district court below utilized a balancing analysis and struck a balance in favor of disclosure. We do not believe it erred.

In *United States v. Nixon*, the Supreme Court considered the interests underlying a presidential claim of executive privilege against the interest underlying a prosecutorial attempt to gather evidence in an ongoing criminal prosecution. Although the Court recognized that "great deference" is to be accorded the constitutionally based, fundamental privilege of presidential communications, it nevertheless concluded that the executive privilege may be outweighed by the "legitimate needs of the judicial process." 418 U.S. at 706–07, 94 S.Ct. at 3107. Where the privilege was asserted solely on the basis of a "generalized interest in confidentiality," the Court held that it could not prevail over a "demonstrated, specific need for evidence in a pending criminal trial." *Id.* at 713, 94 S.Ct. at 3110.

The factors in favor of disclosure in the instant case are at least as strong as those in *United States v. Nixon*. The Supreme Court's observations in that case apply with equal force here:

> We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense.

418 U.S. at 709, 94 S.Ct. at 3108. Indeed, the considerations supporting disclosure in the case at bar are even stronger than those in *Nixon* in that the rights of defendants are at stake rather than the interests of the prosecution. *See generally Will v. United States*, 389 U.S. at 96–98, 88 S.Ct. 269.

■ We thus conclude that the authorization cards cannot be kept completely confidential. However, in view of the important and valid public interest in maintaining the confidentiality of authorization cards, and under the specific circumstances of this case, we feel that a more limited order of disclosure than that issued by the district court is warranted. Accordingly, the district court's disclosure order is modified[9] as follows: The subpoenaed authorization cards and membership applications are to be disclosed to the attorneys for the defendants, but they are not to be disclosed to the defendants themselves. The records are to be produced in bulk rather than individually to ensure that knowledge of the identities of the employees who signed the cards can be confined to counsel. This compromise will enable the defendants' attorneys to determine whether any of the cards were forged or are relevant to the defense. At the same time, the confidentiality of the employees will be adequately protected. Should specific forgeries be found or should an explicit showing of need

---

8. In *Roviaro v. United States*, the Supreme Court held that the scope of the informer privilege was to be limited by its underlying purpose. 353 U.S. at 60, 77 S.Ct. 623. In the instant case, the scope of the privilege of the authorization cards must be similarly limited to ensuring that employees who sign authorization cards are free from reprisal and coercion. Hence, as long as the rights and safety of such employees can be adequately protected, the strict confidentiality of the cards must give way to a sufficient showing of need for disclosure.

9. We acknowledge that great deference is to be accorded the district court's decision as to the scope of a subpoena or disclosure order. *United States v. Nixon*, 418 U.S. at 702, 94 S.Ct. 3090. However, since we are of the opinion that the district court did not give due recognition to the importance of maintaining the confidentiality of the authorization cards, we are modifying the district court's order to provide for limited disclosure. *Cf. In re Attorney General of the United States*, 596 F.2d at 65–68.

be made, then the district court in its discretion may order full disclosure of the specific cards in question. If after examining the cards counsel for defendants wish to interview particular employees, they may do so outside the presence of the defendants and in the presence of the court or a magistrate so that any interviewed employee will be protected from intimidating or coercive questioning. *See generally* Note, *NLRB Discovery After Robbins: More Peril for Private Litigants*, 47 Fordham L.Rev. 393, 413–14 (1978).

### 4. *The Contempt Orders*

With respect to the civil contempt order, we find that the district court did not abuse its discretion. As we have already noted, a civil contempt order is remedial and coercive in nature, and is intended to secure compliance with lawful judicial decrees. It is essential that the courts have the power to compel the appearance of witnesses and the production of evidence. *Shillitani v. United States*, 384 U.S. at 368–70, 86 S.Ct. 1531. In order for a civil contempt order to issue, there must be clear and convincing proof of a violation of a court decree. *Hart Schaffner & Marx v. Alexander's Department Stores, Inc.*, 341 F.2d 101, 102 (2d Cir. 1965) (per curiam); *Stringfellow v. Haines*, 309 F.2d 910, 912 (2d Cir. 1962). Our review of the record leads us to conclude that the evidence clearly and convincingly established grounds for a finding of civil contempt.

With respect to the criminal contempt order, different considerations come into play. The purposes of a criminal contempt order are to punish wilful disregard of the authority of the courts and to deter the occurrence of similar derelictions. *United States v. United Mine Workers*, 330 U.S. 258, 302–03, 67 S.Ct. 677, 91 L.Ed. 884 (1947). As the Supreme Court has noted, "[c]riminal contempt is a crime in the ordi-

nary sense; it is a violation of the law, a public wrong . . . ." *Bloom v. Illinois*, 391 U.S. 194, 201, 88 S.Ct. 1477, 1481, 20 L.Ed.2d 522 (1968). A conviction for criminal contempt frequently results in serious penalties and carries the same stigmas as does an ordinary criminal conviction. *Id.* at 201–02, 207–08, 88 S.Ct. 1477. *See In re Attorney General of the United States*, 596 F.2d at 65; *United States v. Wendy*, 575 F.2d 1025, 1030 (2d Cir. 1978). A judge should resort to criminal contempt only after he determines that holding the contemnor in civil contempt would be inappropriate or fruitless. *Shillitani v. United States*, 384 U.S. at 371 & n. 9, 86 S.Ct. 1531 & n. 9. Thus, in our opinion the criminal contempt power is best exercised with restraint.

To warrant being held in criminal contempt,

> the contemnor's conduct must constitute misbehavior which rises to the level of an obstruction of and an imminent threat to the administration of justice, and it must be accompanied by the *intention* on the part of the contemnor *to obstruct, disrupt or interfere with the administration of justice.*

*In re Williams*, 509 F.2d 949, 960 (2d Cir. 1975) (emphasis added), *citing inter alia Eaton v. City of Tulsa*, 415 U.S. 697, 94 S.Ct. 1228, 39 L.Ed.2d 693 (1974) (per curiam), and *In re Little*, 404 U.S. 553, 92 S.Ct. 659, 30 L.Ed.2d 708 (1972) (per curiam). In the *Williams* case, we reversed the district court's judgment holding the contemnor in criminal contempt on the grounds the evidence failed to establish beyond a reasonable doubt that the requisite intent was present.

In view of the fact that we have modified Judge Bramwell's disclosure order, the criminal contempt order is vacated and the matter is remanded to the district court for reconsideration in light of this opinion.[10]

---

**10.** We note that the Board might well not have defied the district court's order had it been modified in the first instance. Moreover, the Board had no feasible alternative to test the propriety of the discovery order but to disobey

it and be held in contempt. Finally, Irving's refusal to produce the authorization cards was based on Board instructions and a well-founded, judicially recognized Board policy of confidentiality. The Board did not delay in filing

The civil contempt order is affirmed insofar as it relates to the district court's disclosure order as modified herein.

MANSFIELD, Circuit Judge (concurring and dissenting):

I concur in Judge Werker's carefully considered opinion except for its provision that upon remand any interview of employees by attorneys for the defendants must be conducted "in the presence of the court or a magistrate so that any interviewed employee will be protected from intimidating or coercive questioning" (p. 1037, *supra*). In my view this requirement may have just the opposite effect from that intended. In addition, since many employees are involved, it could result in unnecessary waste of judicial resources and inconvenience to employees.

To require employees who may possibly become witnesses to leave work and proceed to court for interrogation by defense counsel in a strange and formal atmosphere before a judicial official unfamiliar to them may well serve to increase, rather than ease, the apprehension of the employees, as well as to heighten the chance that their identities will become known to the defendants themselves. Since the defendants are already faced with criminal charges in the district court as well as with unfair labor practice charges before the National Labor Relations Board, the chance that their counsel would attempt to intimidate a witness in a private interview strikes me as minimal, particularly since evidence of intimidation might be admissible against the defendants at trial. *See United States v. Lord*, 565 F.2d 831, 835 n. 2 (2d Cir. 1977); *United States v. Cirillo*, 468 F.2d 1233, 1240 (2d Cir. 1972), *cert. denied*, 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973); 2 Wigmore, Evidence § 278 (3d ed. 1940).

We are not here dealing with the possibility of one or two interviews but with the prospect of interviews of some 150 or more employees.[1] The employees, moreover, may prove to be important to the defense not only to determine whether their signatures were forged (which would require very little questioning) but also to find out whether they were coerced into signing the cards by either Matthew Eason, a convicted felon, or by his alleged henchman Fred Lawson, who, according to the appellees, has been convicted of a long series of felonies, including assault, rape, forgery, and possession of a deadly weapon and of narcotics.

The only practical method for determining whether the employees were subjected to coercion or duress would be to permit defense counsel to interview each employee who signed an authorization card (or at least those who are in the bargaining unit and whose cards were not clearly forged). Each of these interviews would take more time than a mere interrogation to determine the authenticity of the signature. Since defense counsel would not know which employees might have been the subject of coercion or duress, they would, under the majority's decision, be forced to subpoena a large number of employees to appear in court for questioning, which would lead to a substantial waste of judicial resources and a greater risk of identification by the defendants.

If approached informally at home or at work the average employee would in my view be much more likely to cooperate in answering questions, particularly if he realized that failure to do so would require him to appear pursuant to subpoena before a magistrate, than if he were forced in the first place to come to court and spend a good deal of time waiting around to be questioned. In short, there would be less risk of intimidation, less waste, and less danger of identification or retaliation by the defendants if the witnesses were inter-

---

this appeal and all necessary steps were taken to ensure that this matter would proceed expeditiously.

1. The exact number of authorization cards submitted by Local 20408 is unknown, but the

NLRB requires signatures of at least 30% of the employees to accompany any representation petition, and IDC has some 500 employees. See Brief for U.S. Attorney at 4; Appendix at 85–86.

viewed privately by defense counsel and brought before the judge or magistrate only if they proved to be recalcitrant.

I further believe that it should be made clear to the district court that in vacating the criminal contempt order and remanding the matter to it for reconsideration we are not holding that it would be an abuse of discretion for the district court, after full consideration of the record in the light of our modification of its order, to exercise its power to hold parties in criminal contempt. Since we have substantially modified the district court's order so as to preclude access to the authorization cards by the defendants personally and the NLRB had no feasible alternative for testing the original discovery order, we must give the district court the opportunity to reconsider its holding and penalty in the light of our modification and appellant's decision to comply or not to comply with the order as modified. See *Nilva v. United States*, 352 U.S. 385, 396, 77 S.Ct. 431, 1 L.Ed.2d 415 (1957); *Yates v. United States*, 356 U.S. 363, 366, 78 S.Ct. 766, 2 L.Ed.2d 837 (1958); *Donovan v. City of Dallas*, 377 U.S. 408, 414, 84 S.Ct. 1579, 12 L.Ed.2d 409 (1964); and *Southern Railway Co. v. Lanham*, 403 F.2d 119, 135 (5th Cir. 1968).